**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL THURBER, *individually and on behalf of all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>GRAPHIC PACKAGING HOLDING COMPANY, MICHAEL P. DOSS, and STEPHEN R. SCHERGER,<br><br>Defendants. | No. 1:26-cv-03790-JAV<br><br>CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

Page

I. INTRODUCTION .......... 1

II. NATURE OF THE ACTION .......... 1

III. JURISDICTION AND VENUE .......... 7

IV. PARTIES .......... 7

A. Lead Plaintiff .......... 7

B. Defendants .......... 8

V. BACKGROUND FACTS .......... 9

A. Background on Graphic Packaging .......... 9

B. Background on the Kinaxis System .......... 11

C. Background on Economic Principles of Absorption Costing .......... 11

D. Confidential Witnesses ("CWs") .......... 13

VI. SUBSTANTIVE ALLEGATIONS .......... 15

A. Inventory Buildup Across Facilities .......... 16

B. Reasons for the Buildup .......... 18

1. Unrealistic, Unsupported Forecasts for Customer Demand .......... 19

2. Production Was Prioritized Over Demand .......... 19

3. Loss of Major Customer Accounts .......... 20

C. Defendants were Aware of the Inventory Backlog .......... 23

D. Defendants Hid Inventory Issues and Ignored Warnings .......... 24

E. Defendants' Wrongdoing Begins to be Revealed .......... 28

F. Defendants Continue to Mislead Investors by Assuring the Market of Graphic Packaging's Market Position and Ability to Manage Costs, Cash Flow, and Volume .......... 30

G. The Truth Fully Emerges on February 3, 2026 .......... 35

VII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS .......... 38

A. Graphic Packaging's Q4 and FY 2024 Financial Results .......... 39

1. Misstatement No. 1—Q4 and FY 2024 Financial Results .......... 39

B. Graphic Packaging's Q4 and FY 2024 Earnings Call .......... 41

1. Misstatement No. 2—Q4 and FY 2024 Earnings Call ............................ 41
2. Misstatement No. 3—Q4 and FY 2024 Earnings Call ............................ 43
3. Misstatement No. 4—Q4 and FY 2024 Earnings Call ............................ 45
4. Misstatement No. 5—Q4 and FY 2024 Earnings Call ............................ 48

C. February 27, 2025 Bank of America Global Agricultural and Materials Conference ............................ 51
1. Misstatement No. 6—BofA Conference ............................ 51

D. Graphic Packaging Q1 2025 Financial Results ............................ 53
1. Misstatement No. 7—Q1 2025 Earnings Call ............................ 53
2. Misstatement No. 8—Q1 2025 Earnings Call ............................ 56
3. Misstatement No. 9—Q1 2025 Earnings Call ............................ 57
4. Misstatement No. 10—Q1 2025 Earnings Call ............................ 59

E. June 11, 2025 Wells Fargo Industrials Conference ............................ 61
1. Misstatement No. 11—WF Conference ............................ 62
2. Misstatement No. 12—WF Conference ............................ 64

F. Graphic Packaging Q2 2025 Financial Results ............................ 66
1. Misstatement No. 13—Q2 2025 Earnings Call ............................ 66
2. Misstatement No. 14—Q2 2025 Earnings Call ............................ 68
3. Misstatement No. 15—Q2 2025 Earnings Call ............................ 70
4. Misstatement No. 16—Q2 2025 Earnings Call ............................ 72
5. Misstatement No. 17—Q2 2025 Earnings Call ............................ 74
6. Misstatement No. 18—Q2 2025 Earnings Call ............................ 76
7. Misstatement No. 19—Q2 2025 Earnings Call ............................ 78

G. September 3, 2025 Jefferies Industrials Conference ............................ 81
1. Misstatement No. 20—Jefferies Conference ............................ 81

H. Graphic Packaging Q3 2025 Financial Results ............................ 83
1. Misstatement No. 21—Q3 2025 Financial Results ............................ 83
2. Misstatement No. 22—Q3 2025 Earnings Call ............................ 85
3. Misstatement No. 23—Q3 2025 Earnings Call ............................ 87
4. Misstatement No. 24—Q3 2025 Earnings Call ............................ 89
5. Misstatement No. 25—Q3 2025 Earnings Call ............................ 92

VIII. ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ............................. 94

A. The Defendants Knew of, or Recklessly Disregarded, Overwhelming Internal Information of a Severe Inventory Crisis Driven by Overproduction, Collapsing Customer Demand, and Ignored Warnings, Yet Ordered Production to Continue ............................................................. 94

1. Kinaxis Told Defendants They Were Over-Producing............................ 94

2. Inventory Levels Were at Historic Highs Across Multiple Facilities....... 96

3. Loss of Major Customer Accounts ......................................................... 97

4. The Company's Institutional Practice of Never Shutting Down Mills ........................................................................................................ 98

5. Monthly and Quarterly Reports Showed Deteriorating Performance....... 99

B. Motive and Opportunity to Commit Fraud ...................................................... 101

1. Overproduction to "Smooth" Earnings and Meet Financial Guidance Provided Motive to Commit Fraud....................................... 101

2. Executive Compensation Tied to Performance Metrics Provided Additional Motive to Commit Fraud .................................................... 104

3. The Individual Defendants Had Unfettered Opportunity to Commit Fraud ..................................................................................................... 105

C. Executive Departures Strengthen the Inference of Scienter .............................. 106

D. Analysts' Frequent Interest In and Questions About Graphic Packaging's Inventory and Customer Demand and Defendants' Proclaimed Knowledge ..... 108

E. It Would Be Absurd to Conclude That the Individual Defendants Were Unaware of the Company's Inventory Levels Connected to the Company's Most Important Business Segment .................................................................. 110

IX. LOSS CAUSATION.......................................................................................... 112

A. First Partial Corrective Disclosure: May 1, 2025 .............................................. 112

B. Second Partial Corrective Disclosure: December 8-9, 2025 ............................. 115

C. Third and Final Corrective Disclosure: February 3, 2026................................. 117

D. Absence of Confounding Factors...................................................................... 119

E. Cumulative Damages ........................................................................................ 120

X. CONTROL PERSON ALLEGATIONS ........ 120

XI. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE ........ 122

XII. PRESUMPTION OF RELIANCE ........ 123

XIII. CLASS ACTION ALLEGATIONS ........ 125

XIV. CLAIMS OF RELIEF ........ 127

XV. REQUEST FOR RELIEF ........ 131

XVI. JURY TRIAL DEMAND ........ 132

## I. INTRODUCTION

Lead Plaintiff Saskatchewan Healthcare Employees' Pension Plan ("Lead Plaintiff" or "SHEPP"), individually and on behalf of all others similarly situated, alleges the following based upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon Lead Plaintiff's personal knowledge. Lead Plaintiff's information and belief is based upon the investigation undertaken by Lead Counsel, Labaton Keller Sucharow LLP, which included a review and analysis of: (i) regulatory filings made by Graphic Packaging Holding Company ("Graphic Packaging" or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"), (ii) Company press releases, transcripts of earnings calls, and other public statements issued and disseminated by the Company; (iii) Company website and marketing materials; (iv) price and volume data for Graphic Packaging's common stock; (v) research reports from securities and financial analysts; (vi) news and media reports concerning the Company and other facts related to this action; (vii) interviews with former Graphic Packaging employees; and (viii) other publicly available materials and data. Lead Counsel's investigation into the factual matter alleged herein continues, as many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiff believes that substantial additional evidentiary support exists for the allegations herein and will continue to be revealed after Lead Plaintiff has a reasonable opportunity for discovery.

## II. NATURE OF THE ACTION

1. Graphic Packaging is a global designer and producer of consumer packaging, operating one of the largest portfolios of paperboard and packaging solutions in the world. The Company's common stock trades on the New York Stock Exchange under the ticker symbol "GPK." During the Class Period (defined below), Graphic Packaging was led by Defendant Michael P. Doss, the Company's former President, CEO, and a Director, and Defendant Stephen

R. Scherger, the Company's former EVP and CFO (the "Individual Defendants" and, together with Graphic Packaging, the "Defendants"). Both Defendants Doss and Scherger departed from the Company before the end of the Class Period—Defendant Scherger on November 7, 2025, and Defendant Doss, abruptly and without explanation, on December 31, 2025.

2. Throughout the period from February 4, 2025 through February 2, 2026, inclusive (the "Class Period"), Defendants made materially false and misleading statements and omissions concerning Graphic Packaging's inventory, inventory management capabilities, customer demand conditions, and financial outlook. Defendants repeatedly assured investors that the Company was effectively "***matching supply and demand***," that "***Customer destocking is largely over***,"[1] and that Graphic Packaging was experiencing "***strong and steady***" results and was "***well positioned***" to deliver on its financial guidance.

3. These statements, and others alleged herein, were materially false and misleading. In reality, throughout the Class Period, Graphic Packaging was experiencing a severe inventory crisis: the Company's facilities were "bursting at the seams" with historically high inventory levels, customer demand had collapsed, major customer accounts had been lost, and the Company's own internal forecasting systems—including a sophisticated demand planning platform called Kinaxis RapidResponse (n/k/a Kinaxis Maestro) ("Kinaxis")— expressly warned that production should be curtailed. Defendants knew of or recklessly disregarded these conditions during the Class Period and concealed them from investors. When, early in the Class Period, Defendant Doss was confronted with express warnings from the Kinaxis system that production should be halted, and plant data indicating detrimental levels of existing inventory, he personally

[1] Destocking refers to the process of eliminating excess inventory from a business's facilities and/or warehouses. Thus, when Defendants say "customer destocking," it means its customers reducing packaging inventory they already have on hand instead of buying new packaging.

overrode those warnings and ordered production to continue. The Company then scrapped the Kinaxis project entirely, eliminating the internal system that was providing accurate demand forecasts that contradicted the Defendants' preferred narrative.

4. The scope and severity of the inventory crisis that Defendants concealed was staggering. Confidential witnesses—former Graphic Packaging employees with firsthand knowledge of plant-level conditions—have confirmed that starting in 2024 and throughout 2025, facilities across the Company were overwhelmed with an unsold glut of products and raw materials. Warehouses were filled to capacity. Plants were "bursting at the seams." At one facility, a confidential witness described the mounting backlog as a "death cycle"—a self-reinforcing spiral in which the Company continued pouring cash into manufacturing product that had no buyer and no prospect of sale. The crisis was not confined to a single plant or product line; it spanned raw paper mills, converting plants, and specialty operations from the Midwestern, Southern, and Western United States. And it was driven not by unforeseeable shifts in the market, but by Defendants' own deliberate choices: reliance on unsupported and contradicted demand forecasts that overstated customer need by as much as 30%, an institutional refusal to curtail production even when the Company's own systems demanded it, and the loss of major customer accounts—including Chick-fil-A, Nissin Foods, and Burger King—that Defendants failed to disclose to investors.

5. The Defendants overproduced inventory, even without the requisite customer demand, so that Graphic Packaging could defer recognition of fixed manufacturing overhead through absorption costing and thereby artificially inflate reported profits. The motive was straightforward: under absorption costing, fixed manufacturing overhead—including factory rent, equipment depreciation, and plant salaries—is spread across all units produced. When a company

produces more units than it sells, the unsold units carry a portion of those fixed costs onto the balance sheet as inventory rather than recognizing those costs as an expense on the income statement. Thus, the more a company overproduces without selling the resulting inventory, the less fixed manufacturing cost is recognized in the current period, making reported profits appear higher even though the company has not performed better and has incurred the same underlying fixed costs.

6. For example, in Scenario A, assume a company produces 100 units and sells all 100 units, with $10,000 in fixed manufacturing overhead. Each unit absorbs $100 of overhead ($10,000 divided by 100 units). Because all 100 units are sold, the full $10,000 of fixed overhead flows to cost of goods sold on the income statement. Reported expenses therefore fully reflect the fixed manufacturing costs incurred during the period.

7. By contrast, in Scenario B, assume the same company produces 1,000 units but sells only 100 units, with the same $10,000 in fixed manufacturing overhead. Each unit now absorbs only $10 of overhead ($10,000 divided by 1,000 units). Because only 100 units are sold, only $1,000 of the $10,000 fixed overhead is recognized as cost of goods sold on the income statement. The remaining $9,000 is deferred on the balance sheet as part of the unsold inventory. All else being equal, reported profits are therefore $9,000 higher than in Scenario A—not because the company performed better, but because it overproduced.

8. This is precisely what Defendants did. They continued to overproduce inventory even without customer demand so that fixed manufacturing overhead would be spread across more units, deferring recognition of those costs and making Graphic Packaging's profits appear higher than they actually were. The deferred costs did not disappear; they remained embedded in unsold inventory and would later burden the Company when that inventory was sold, written down, or

otherwise reduced. This fraud allowed Defendants to meet short-term financial targets or lessen the severity of misses, thereby maintaining artificially inflated stock prices.

9. This is confirmed by the Company's own financial guidance trajectory. At the start of the Class Period, on February 4, 2025, Defendants projected full-year 2025 adjusted EBITDA of $1.66 billion to $1.76 billion, adjusted EPS of $2.48 to $2.73, and net sales of $8.6 billion to $8.8 billion. Over the following nine months, as Defendants were forced to begin curtailing production as the inventory glut swelled to the Company's physical limits, they could no longer defer fixed overhead costs through continued overproduction and, as a result, adjusted EBITDA guidance was slashed repeatedly: first to $1.4 billion to $1.6 billion in May 2025, then to $1.45 billion to $1.55 billion in July 2025, and finally to $1.40 billion to $1.45 billion in November 2025. The Company ultimately reported full-year 2025 adjusted EBITDA of just $1,395 million—missing even the floor of its final, already-reduced guidance by $5 million, and falling $265 million below the midpoint of its initial guidance.

10. Critically, net sales held up throughout the year, coming in at $8,617 million—at the high end of the Company's final guidance range and within the initial guidance range. This divergence is significant: if the Company's financial deterioration were attributable to reduced customer demand or competitive factors, as Defendants represented, net sales would have declined commensurately with EBITDA. Instead, the revenue line held while the profitability metrics collapsed. The only explanation consistent with this pattern is that the EBITDA shortfall was driven not by falling demand or competitive pressures, but by the recognition of previously deferred fixed manufacturing costs once Defendants could no longer sustain overproduction—precisely the consequence of unwinding the absorption costing manipulation alleged herein.

11. The truth was gradually revealed through a series of partial corrective disclosures beginning on May 1, 2025, when the Company reported disappointing first quarter 2025 results and slashed its full-year guidance. The Company reported Q1 non-GAAP EPS of $0.51, missing consensus estimates by $0.07, and revenue of $2.12 billion, representing a 6.2% year-over-year decline and missing consensus estimates by $10 million. It slashed its full-year adjusted EBITDA outlook from a range of $1.68 billion to $1.78 billion to $1.4 billion to $1.6 billion and its adjusted EPS outlook from $2.53 to $2.78 to $1.75 to $2.25, blaming "an expectation of a 2% volume decline and $80 million of input cost inflation at the midpoint" and "higher macroeconomic and consumer spending uncertainty." The stock price fell 15.57% on this news.

12. The truth continued to emerge on December 8, 2025, when the Company announced it was accelerating inventory reduction plans and, simultaneously, announced the surprise departure of Defendant Doss as CEO and Director. The stock price fell another 8.66%.

13. Finally, on February 3, 2026, the Company reported its fourth quarter and full year 2025 results and revealed that it would take a $130 million hit to 2026 EBITDA from "actions taken to reduce inventory"—an admission that the Company's inventory problems were far more severe and persistent than Defendants had previously suggested. The stock price fell another 15.97%. In total, the partial corrective disclosures and final corrective disclosure caused Graphic Packaging's stock price to decline by approximately $7.65 per share from its Class Period high—a cumulative decline of approximately 51%.

14. Lead Plaintiff seeks to recover damages on behalf of all members of the Class (defined below) who purchased or otherwise acquired Graphic Packaging common stock during the Class Period at prices artificially inflated by Defendants' materially false and misleading statements and omissions, and who were damaged as the truth was revealed.

## III. JURISDICTION AND VENUE

15. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b) and 78t(a)) (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

16. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

17. Personal jurisdiction and venue are proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Graphic Packaging stock trades on the New York Stock Exchange ("NYSE") located in this Judicial District. Defendants conduct business in this Judicial District, and the acts and practices complained of herein occurred in substantial part in this Judicial District.

18. In connection with the acts, conduct, and other wrongs alleged in the Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## IV. PARTIES

### A. Lead Plaintiff

19. Lead Plaintiff Saskatchewan Healthcare Employees' Pension Plan is a defined benefit plan that serves healthcare employees in Saskatchewan, Canada. As set forth in its Lead Plaintiff Certification (ECF No. 17-1), SHEPP purchased Graphic Packaging common stock during the Class Period and suffered damages as a result of Defendants' violations of the federal securities laws alleged herein. SHEPP specifically purchased 283,055 shares of Graphic Packaging common stock from May 2, 2025 through December 9, 2025.

**B. Defendants**

20. Defendant Graphic Packaging Holding Company is a Delaware corporation with principal executive offices located at 1500 Riveredge Parkway, Atlanta, Georgia 30328. Graphic Packaging is a global designer and producer of packaging for consumer products, operating with a portfolio of brands in consumer industries such as food and beverage, foodservice, household products, beauty, and healthcare. Graphic Packaging's common stock trades in an efficient market on the NYSE under the ticker symbol "GPK."

21. Defendant Michael P. Doss was the former President and CEO of Graphic Packaging, and served as a Director of the Company's Board of Directors, at all relevant times during the Class Period, until his departure from the Company on December 31, 2025. During the Class Period, in his role as CEO of Graphic Packaging, Defendant Doss participated in various media interviews, earnings calls, and conferences with securities analysts, during which he made false and misleading statements and omissions of material fact as alleged herein.

22. Defendant Stephen R. Scherger was the former EVP and CFO of Graphic Packaging at all relevant times during the Class Period, until his departure from the Company on November 7, 2025. During the Class Period, in his role as CFO, Defendant Scherger participated in various media interviews, earnings calls, and conferences with securities analysts, during which he made false and misleading statements and omissions of material fact as alleged herein.

23. Defendants Doss and Scherger are collectively referred to herein as the "Individual Defendants." The Individual Defendants, by virtue of their high-level positions at Graphic Packaging, possessed the power and authority to control, and did actually control, the contents of Graphic Packaging's SEC filings, press releases, investor presentations, and other market communications during the Class Period. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to their

issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew, or recklessly disregarded, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## V. BACKGROUND FACTS

### A. Background on Graphic Packaging

24. Graphic Packaging, together with its subsidiaries, is a global leader in the design, production, and sale of consumer packaging products. The Company's product portfolio includes cartons, multipack cartons, trays, carriers, paperboard canisters, cups, and bowls manufactured from bleached and unbleached paperboard and recycled paperboard. These packaging products serve a broad range of end-use markets, including beverage (beer, soft drinks, energy drinks, water, and juices), food (cereal, desserts, frozen and refrigerated foods, and pet foods), prepared foods (snacks and quick-serve restaurant items) and household products (detergent, health care, and beauty aids). These products are sold through direct sales offices and through broker arrangements with third parties.

25. Beginning in the first quarter of 2025, *i.e.*, the beginning of the Class Period, the Company realigned its financial reporting structure under two reportable segments: (1) International Paperboard Packaging and (2) Americas Paperboard Packaging. According to the Company's 2025 Form 10-K, "this structure aligns with how the Chief Operating Decision Maker ("CODM") measures segment operating results, allocates resources among the segments and assesses segment performance." As explained by the Company, Graphic Packaging CODM, at all relevant times, was its CEO, *i.e.*, Defendant Doss, and, after his departure, Robbert Rietbroek.

26. The International Paperboard Packaging segment includes packaging sold primarily to consumer packaged goods companies (*i.e.*, companies serving the food, foodservice, beverage, and consumer product markets) serving customers outside of the Americas. According to the Company's 2025 Form 10-K, this segment generated approximately 25.6% of the Company's reported net sales.

27. The Americas Paperboard Packaging segment includes paperboard packaging sold primarily to consumer packaged goods companies in the Americas. According to the Company's 2025 Form 10-K, this segment generated ***68%*** of the Company's reported net sales. Importantly, the Company also explained in its 2025 Form 10-K that net sales "of individual countries outside of the United States are not material." Accordingly, the Company's operations in the Americas, and more specifically, within the United States, were the primary sources of net sales, revenues, and profitability for the Company during the Class Period.

28. Graphic Packaging has 54 facilities in the United States, spanning across five regions: the Northeast (four facilities), the South (22 facilities), the Midwest (22 facilities), the West (one facility) and the West Coast (five facilities). These facilities produce the raw materials used to create their products—materials such as corrugated board, paperboard, and recycled fibers—and the products themselves. Graphic Packaging's customer base includes many widely recognized consumer brands and multinational corporations, including Anheuser-Busch, PepsiCo, McDonald's, Kraft Heinz, and L'Oreal.

29. At all relevant times, Defendants touted the purported strength and stability of Graphic Packaging's business model and operations, as well as the Company's purported ability to deliver on its cost and inventory reduction, free cash flow, and profitability goals.

**B. Background on the Kinaxis System**

30. Kinaxis Maestro (formerly known as Kinaxis RapidResponse) is a management system built specifically for supply chain management and matching supply to demand. The platform partners with the world's largest supply chains and enables users to receive real-time inventory alerts to ensure smooth supply network production.

31. Using algorithms based on a company's internal data, the Kinaxis inventory manager function allows the user to adjust supply and demand metrics while simulating future supply chain scenarios. With this internal data, the platform generates inventory dashboards that enable companies and their management to consistently monitor live trends in their facilities. Kinaxis claims that these dashboards improve visibility by creating a broader, unified view of the entire production line for users. Overall, Kinaxis promotes greater efficiency for supply chains by providing the most up-to-date production data.

32. Kinaxis' website explains how it utilizes and combines a "context-aware agentic AI" and a "purpose-built decision-making platform" to help its customers (including Graphic Packaging) "anticipate disruptions" within the supply-chain ecosystem, "orchestrate responses," and "make better decisions at unprecedented speed."[2]

33. As alleged below, Defendants used Kinaxis during the Class Period.

**C. Background on Economic Principles of Absorption Costing**

34. Absorption costing, also known as "full costing," is an accounting method used for valuing manufactured inventory. Under this method, all production costs—including raw materials, labor, and variable and fixed manufacturing overhead—are assigned to each unit produced.

---

[2] https://www.kinaxis.com/en

35. Generally Accepted Accounting Principles ("GAAP") requires that all companies employ absorption costing when valuing manufactured inventory. The guidelines for implementing absorption costing are established under Accounting Standards Codification 330-10-30.

36. The key feature of absorption costing is how it treats fixed manufacturing overhead.[3] Rather than being expensed when occurred, these fixed costs are "absorbed" by each unit produced and sit on the company's balance sheet as part of inventory value until the goods are sold. Only when inventory is sold do the embedded fixed costs move from the balance sheet to the income statement as part of cost of goods sold.

37. This treatment directly affects a company's reported financial results. Because fixed overhead is embedded in inventory rather than immediately expensed, cost of goods sold in any period reflects only the overhead tied to actual units sold, not the full overhead incurred. When a company produces more than it sells, a portion of that period's fixed overhead is carried on the balance sheet as higher inventory balances rather than recognized as an expense. This deferral results in "income smoothing," as reported cost of goods sold decrease and gross margins increase, resulting in higher reported net income than if those fixed costs had been expensed as incurred.

38. This dynamic is known as the "inventory buildup" effect. When production volumes increase—whether or not customer demand follows—each unit produced absorbs a share of fixed overhead. The more units produced and unsold, the more total fixed overhead is capitalized into inventory rather than recognized as current-period expense and deferred into inventory on the balance sheet.

---

[3] Fixed manufacturing overhead includes costs like factory rent, equipment depreciation, and plant management salaries, among other costs.

39. Accounting authorities have recognized that absorption costing can create an incentive to overproduce because doing so defers fixed cost recognition and inflates reported profitability in the near term.[4] The deferred costs do not disappear; they remain in inventory on the balance sheet and will eventually be recognized as expenses when the inventory is sold or written down.[5] Until that happens, however, a company's earnings are smoothed, presenting a picture of profitability and inventory value that does not fully reflect the fixed manufacturing costs actually incurred during the reporting period.

**D. Confidential Witnesses ("CWs")[6]**

40. The confidential witness accounts set forth hereinafter are not isolated anecdotes from a single facility or region; they reflect testimony from former employees stationed across Graphic Packaging's nationwide operations. The confidential witnesses worked at, visited, oversaw, or otherwise had insight into no fewer than thirteen distinct Company facilities, including manufacturing plants in California, Oregon, Minnesota, Wisconsin, Illinois, Indiana, and Ohio. These facilities represent the full spectrum of Graphic Packaging's paperboard and packaging operations in the United States—from paper mills producing raw paperboard and paper rolls, to converting facilities manufacturing folding cartons, food packaging, and corrugated products, to specialty operations handling materials processing. These confidential witness accounts thus draw from the core of the Company's production network, not its periphery.

41. CW-1 was employed at Graphic Packaging from February 2019 through May 2026. CW-1's most recent role was as Account Executive from February 2023 through May 2026. CW-

[4] *See, e.g.*, Benjamin P Foster & Sidney J. Baxendale, *The Absorption vs. Direct Costing Debate*, *in* 22 COST MANAGEMENT 40 (2008).
[5] *See id.*
[6] CWs will be identified herein by number (CW-1, CW-2, etc.). All CWs will be described in the masculine to protect their identities.

1 was responsible for maintaining a book of business and trying to bring in new customers in the food and beverage industry. CW-1 reported to Khayla Graves, current Sales Director – West Region.

42. CW-2 was employed at Graphic Packaging from October 2024 through March 2025, most recently as a manufacturing supervisor at the Company's Solon, Ohio manufacturing facility. CW-2 oversaw the cutting and folding of the cardboard produced at the facility.

43. CW-3 was employed at Graphic Packaging decades before the start of the Class Period through the end of the Class Period, most recently in a senior sales role.

44. CW-4 was employed at Graphic Packaging from July 2022 to May 2025 as a senior manager in the Foodservice division.

45. CW-5 was employed at Graphic Packaging from April 2022 to December 2025 as a sales representative. In that role, CW-5 noted that he most recently reported to current Sales Director Dale Goodwin.

46. CW-6 was employed at Graphic Packaging as a Production Supervisor at the Company's Elk Grove Village, Illinois facility. His facility manufactured cartons for clients including McDonald's, Quaker Oats, and Palermo's Pizza. CW-6 was responsible for, among other things, creating daily inventory sheets at his facility.

47. CW-7 was employed at Graphic Packaging from March 2024 to May 2025 at the Company's Shelbyville, Illinois facility, which mainly manufactured paper cups for direct-to-consumer customers, including McDonald's, Dairy Queen, and Chick-fil-A. CW-7 reported to plant manager Jeff Mayhaus.

48. CW-8 was employed at Graphic Packaging from July 2022 to March 2025 as a Senior Manager, Organizational Change Management. CW-8 worked on implementing a supply

chain management system called Kinaxis RapidResponse. CW-8 most recently reported to former Vice President, Supply Chain Planning and Customer Care Paul Myler.

49. CW-9 was employed at Graphic Packaging from 2020 to April 2025, most recently as Plant Manager of the Solon, Ohio facility. CW-9 explained that the Solon facility manufactured corrugated boxes. CW-9 most recently reported to former Director of Operations and Plant Manager Eddie Lee.

50. CW-10 was employed at Graphic Packaging from August 2023 to May 2025 as a Production Control Manager. CW-10 was responsible for purchasing activity, scheduling, inventory management and capacity planning at the Company's Solon, Ohio plant. CW-10 explained that the Solon plant specialized in manufacturing corrugated cat litter boxes for customers including Sam's Club and Costco Wholesale.

51. CW-11 was employed at Graphic Packaging from February 2020 to April 2026 as a Supply Chain Advisor. CW-11 advised that he was primarily responsible for forecasting customer demand during his tenure.

## VI. SUBSTANTIVE ALLEGATIONS

52. The Class Period began on February 4, 2025, when Defendant Doss acknowledged the "unusual volume challenges for the industry and [Graphic Packaging's] customer" over the past several years but assured "strong and steady" results for 2025 and told investors that Graphic Packaging was "well positioned for 2025." In a press release attached to the Company's Form 8-K, which was filed with the SEC before the market opened, Graphic Packaging forecasted full year 2025 net sales, adjusted EBITDA, and adjusted earnings per share of $8.7 billion to $8.9 billion, $1.68 billion to $1.78 billion, and $2.53 to $2.78, respectively (excluding foreign exchange impacts).

53. Contrary to Defendants' assertions, the reality across Graphic Packaging's facilities painted an entirely different picture.

**A. Inventory Buildup Across Facilities**

54. Beginning in 2024 and throughout 2025, Graphic Packaging's facilities were experiencing a growing trend of inventory glut. Facilities were manufacturing product at a steady rate, but that product was not being sold and distributed to clients. Instead, it was accumulating inside facilities and nearby warehouses.

55. CW-1 explained that Graphic Packaging had locations across the United States and each had their own warehouse that were all experiencing excess inventory issues.

56. According to CW-3, inventory levels in 2025 were the "highest I've ever seen."

57. CW-4 stated that he visited all of Graphic Packaging's Foodservice facilities in 2025, which are located in the following cities: Clarksville, Tennessee; Kenton, Ohio; Shelbyville, Illinois; Visalia, California; Pittston, Pennsylvania; Stone Mountain, Georgia; Marion, Ohio; and Menomonee Falls, Wisconsin. According to CW-4, all of the Foodservice facilities he visited in 2025 had an inventory buildup.

58. CW-4 recalled that inventory piled up at plants, including plants in Shelbyville, Illinois and Visalia, California. CW-4 recalled that in 2025, inventory was a "big concern" at the Shelbyville facility and a "big problem" at the Pittston and Visalia facilities. CW-4 referred to increasing inventory as a "big problem" and a "death cycle" because the Company had so much cash (*i.e.* product) sitting in inventory.

59. CW-4 detailed that the Shelbyville and Visalia plants were at full capacity and had no space for inventory in 2025. CW-4 recalled that the Pittston facility was looking for additional warehouse space because there was no more room in the facility for inventory.

60. CW-5 stated that in 2025 he visited five plants in Illinois and one plant in West Monroe, Louisiana, and each plant was filled with inventory.

61. According to CW-6, inventory at the Elk Grove Village facility began to increase in 2024, “got worse” in 2025, and continued to rise at Elk Grove Village facility throughout the rest of 2025. CW-6 stated that the Elk Grove Village and Carol Stream facilities were “flooded” with paperboards in Fall 2025 from the Waco facility, which, according to CW-6, blindly shipped paperboards and “asked questions later.” CW-6 reported that the Elk Grove Village facility had between 500 and 700 more paper rolls in inventory in Fall 2025 than it normally had.

62. CW-7 noted that the paper mills were required to send his Shelbyville facility raw paper at least 90 days in advance of the purchase orders, which meant his facility had to sit on raw paper inventory for months at a time. CW-7 added that his facility had to rent 750,000 square feet of storage space to store the raw paper.

63. Additionally, CW-7 explained that Company facilities in Tennessee or Kentucky ran out of warehouse space and could not offload excess inventory, and so they sent the finished goods to the Shelbyville facility to warehouse. CW-7 detailed that the Shelbyville facility had 100 trailers “overrun with product” from the Tennessee or Kentucky facilities that were sitting in a parking lot in 2025. CW-7 estimated that the Shelbyville facility was sitting on 30 weeks of inventory from either the Tennessee or Kentucky facilities. CW-7 stated that the Shelbyville facility was forced to pay a demurrage penalty of $100 per trailer per day because it did not have the space in its facility to warehouse the excess inventory.

64. According to CW-2, inventory began building up at the Solon facility beginning in October 2024 and continued until his departure in March 2025. CW-2 stated that the Solon facility was “running out of space” because there was so much inventory.

65. According to CW-10, inventory at the Solon plant was "extraordinarily high" in the first half of 2025 and was "bursting at the seams" because it was filled with product. CW-10 detailed that just prior to his departure in May 2025, he was tasked with finding additional warehouses to store the excess inventory sitting at the Solon plant.

66. Taken together, the foregoing confidential witness testimony establishes that Graphic Packaging's inventory crisis was not confined to a single facility or product line—it was pervasive, severe, and companywide. Across facilities spanning California, Oregon, Minnesota, Wisconsin, Illinois, Indiana, Ohio, Pennsylvania, Georgia, and Tennessee, the Company's plants were overwhelmed with unsold product, running out of warehouse space, renting additional storage, and, in at least one instance, confronting inventory levels so extreme that they posed safety hazards. A multi-decade veteran of the Company described the inventory levels as the "highest I've ever seen." This is not a business that would "absolutely only produce to the demand that is there," as Defendants represented to investors throughout the Class Period.

**B. Reasons for the Buildup**

67. As the following subsections detail, the inventory crisis was driven by multiple, compounding deceptive practices and disregarded problems—each of which was known to or readily ascertainable by Defendants: (1) the Company's reliance on unsupported and contradicted demand forecasts that overstated customer need; (2) an institutional, top-down prioritization of facility production levels over actual customer demand, resulting in the manufacture of product far in excess of existing sales orders; (3) cratering demand; and (4) the loss of multiple major customer accounts, including Chick-fil-A, Nissin Foods, and Burger King. Taken together, these deceptive practices and ignored problems created a severe and escalating inventory backlog that Defendants concealed from the investing public.

### 1. Unrealistic, Unsupported Forecasts for Customer Demand

68. One of the primary drivers of Graphic Packaging's inventory crisis was Defendants' use of unrealistic "demand forecasts" and disregard of contradicting information. *See infra* Sections VI.C-D. As the following confidential witness statements reveal, the Company set its 2025 production targets based on customer demand projections that bore little relationship to actual conditions the Company was experiencing. This witness—who was directly involved in and had firsthand visibility into, the Company's forecasting processes—confirms that the Company's demand forecasts were significantly inflated, resulting in the manufacture of far more product than the market could absorb. This account is significant because, when viewed in totality with the other allegations herein, it demonstrates that the inventory glut was not an unforeseeable consequence of macroeconomic conditions, as Defendants claimed, but rather, a preexisting and growing predictable result of the Company's manipulated internal planning.

69. CW-11 stated that during his tenure, Graphic Packaging calculated its Mean Absolute Percentage Error (MAPE) to determine how accurate its forecasts were in relation to its actual values. CW-11 explained that the Company calculated its MAPE by subtracting forecasts from actual values and then dividing that figure by actual values. According to CW-11, Graphic Packaging's MAPE in 2025 was roughly 30%, which indicated that the Company did not sell the products it forecasted to sell and therefore had the "wrong inventory." CW-11 referred to this as being "out of mix."

### 2. Production Was Prioritized Over Demand

70. The inventory glut was compounded by the Defendants' prioritization of production volume over actual customer demand. The following confidential witnesses describe a corporate culture in which attaining facility-level production targets took precedence over matching output to sales orders—with plants manufacturing product well in excess of existing

purchase orders and forcing downstream facilities to absorb raw materials that they did not need. These accounts demonstrate that the inventory crisis was not merely the product of imprecise planning but reflected a deliberate corporate strategy to maintain production levels regardless of whether the resulting product could be sold, contradicting Defendants' repeated public assurances that they "run [their] business really to demand" and were "aggressively matching supply and demand."

71. CW-7 stated that Graphic Packaging prioritized production over everything else and manufactured more product than it had sales orders for during his tenure. CW-7 said this was done for the facility to hit its production goals.

72. CW-10 stated that one reason for the excess inventory was because the Solon plant was forced to take stock of raw materials, specifically board rolls, from Graphic Packaging's mills in 2025. CW-10 recalled that the Solon plant told Graphic Packaging that it was taking on more raw materials than it needed and that the Company responded, "Too bad." CW-10 suggested that Graphic Packaging forced the Solon plant to take excessive stock of raw materials because it cost a lot of money to run the mills and therefore the mills had to achieve a certain amount of output to justify the cost of running the mills. CW-10 suggested that by manufacturing raw materials that were not needed, the Company was "inflating output."

73. CW-4 stated that the Shelbyville facility continued making more inventory in 2025 after the Chick-fil-A project was cancelled. Even without the Chick-fil-A project, CW-4 detailed that inventory at the Shelbyville facility was a "big concern" in 2025 because sales were slow and therefore inventory built up.

**3. Loss of Major Customer Accounts**

74. Perhaps most damaging to Defendants' narrative of "strong and steady" business performance was the loss of several major customer accounts during 2024 and 2025. The following

confidential witness accounts detail the cancellation of significant projects with prominent national brands—including Chick-fil-A, Nissin Foods, and Burger King—that left Graphic Packaging with substantial volumes of unsold product and unfulfilled revenue projections. These account losses, which were known to senior leadership, stand in stark contrast to Defendants' repeated public assurances about the strength of the Company's customer demand and pipeline. The statements of these confidential witnesses are particularly significant because they demonstrate that the Company's volume and revenue shortfalls were not the result of transient macroeconomic headwinds, as Defendants represented, but rather reflected the permanent loss of major revenue streams.

75. CW-4 stated that Graphic Packaging began working on a project to manufacture paper cups for cold drinks for Chick-fil-A in 2024. CW-4 referred to this project as the "biggest Foodservice project in many years." CW-4 detailed that Doss and Chick-fil-A CEO Andrew Cathy visited the Company's Shelbyville facility together in June 2024, which indicated how big of a project this was for both companies. CW-4 noted that Graphic Packaging's Foodservice division projected huge growth in the second half of 2024 and in 2025 from this Chick-fil-A project. However, CW-4 noted that this Chick-fil-A project never came to fruition because Chick-fil-A cancelled this project in Q3 2024. CW-4 added that Graphic Packaging had to optimize costs to make up for the reduction in revenue that was caused by the Chick-fil-A project cancellation. CW-4 further explained that after the Chick-fil-A project was cancelled in Q3 2024, he provided data for a presentation to members of the C-Suite that detailed the capital impact the cancellation would have on the Foodservice division. CW-4 added that the sales team attempted to find customers to replace the lost Chick-fil-A business but were "not very successful" in doing so. CW-4 noted that the Shelbyville facility had a lot of Chick-fil-A aged inventory in 2025.

76. According to CW-7, Chick-fil-A cancelled an insulated paper cup project with Graphic Packaging and, as a result, the sales team was tasked with replacing the lost business. CW-7 explained that the sales team attempted to replace the lost Chick-fil-A business with smaller customers who hired the Company to manufacture artwork cups. However, CW-7 recalled that a lot of these customers left the Company in 2025.

77. CW-4 also recalled that Graphic Packaging's Foodservice division expected to obtain significant growth in 2025 from a project with Nissin Foods. CW-4 explained that Graphic Packaging began working on a project manufacturing cups for instant noodle soup for Nissin Foods in 2024 in its Visalia, California facility. CW-4 specified that Graphic Packaging expected orders from Nissin Foods to start in August 2024 and increase in January 2025 as a result of this project. However, CW-4 noted that Nissin Foods cancelled this project entirely in February 2025 or March 2025 because it found a cheaper source. According to CW-4, Nissin Foods ultimately cancelled this project in February 2025 because of oil stains leaking into the instant noodle soup cups that Graphic Packaging manufactured for Nissin Foods. CW-4 recalled that Graphic Packaging had a lot of Nissin Foods backlogs in 2025 in its Visalia and Pittston facilities because it could not move the product after the project was cancelled. According to CW-4, the Company manufactured a lot of instant noodle soup cups for the Nissin Foods project before it was ultimately cancelled in February 2025.

78. CW-4 recalled that a third project with Burger King was also cancelled. CW-4 detailed that Graphic Packaging's Foodservice division began to manufacture 14, 18, and 27-ounce cups for Burger King in the second half of 2024. However, CW-4 stated that Burger King cancelled the 27-ounce cups in the second half of 2024. CW-4 noted that the Burger King project cancellation

negatively impacted both volume and revenue projections in 2025, and Graphic Packaging had to repurpose plants in Tennessee after the Burger King project was cancelled.

### C. Defendants were Aware of the Inventory Backlog

79. Graphic Packaging's senior leadership—including the Individual Defendants—had direct, contemporaneous knowledge of the inventory glut while simultaneously assuring investors that the Company was "producing at or below our overall needs" and Defendants were "keeping the business just very dialed in relative to" demand. Multiple confidential witnesses describe regular internal meetings at which the scope and severity of inventory issues were discussed in detail, including quarterly meetings hosted by Defendant Doss, monthly financial reviews led by division leadership, and tier-management meetings involving the Company's C-Suite. This undermines any suggestion that Defendants' misleading public statements were the product of mere negligence or ignorance.

80. CW-3 noted that Company leadership was "very aware" of the inventory buildup. CW-3 attended meetings with current Senior Vice President and Chief Commercial Officer Jean-Francois Roche between 2023 and April 2026 where high inventory was discussed.

81. According to CW-5, decreasing inventory was at the forefront of every quarterly meeting and town hall in 2025, which were hosted by Doss. During those meetings, Doss told attendees that the Company had millions of dollars of boxes sitting in aged inventory and instructed them to make progress on reducing aged inventory. According to CW-5, Doss also presented month-over-month aged inventory charts in the quarterly meetings and town halls in 2025.

82. CW-1 also recalled having quarterly town hall meetings conducted over Teams that were led by the Company's CEO. CW-1 recalled that during one of the town hall meetings, it was mentioned that the company needed to free up cash flow and they laid off thousands of employees to help.

83. CW-9 stated that during his tenure, he attended monthly financial meetings, which were led by the Head of Finance and the Vice President of Manufacturing. CW-9 detailed that the Head of Finance and the Vice President of Manufacturing told attendees during monthly financial meetings in 2024 and in Q1 2025 that certain carton plants were losing business, and the EBITDA numbers and financial figures presented at these monthly financial meetings reflected that different carton plants were "suffering in EBITDA."

84. CW-9 explained that the number one reason given in monthly financial meetings in Q1 2025 as to why carton plants were not hitting their EBITDA numbers was because customer orders and sales declined. CW-9 noted that information presented at monthly financial meetings was consolidated and given to the Company's C-Suite.

85. CW-4 recalled as part of the Company's tier management monthly reviews, Graphic Packaging's C-Suite met with division leaders in the second or third week of every month in 2025. CW-4 detailed that during these monthly meetings, the Company's C-Suite reviewed numbers and results with division leaders. CW-4 recalled that monthly Foodservice business review meetings were led by the Head of Operations, Foodservice. CW-4 explained that all Foodservice data and metrics were reviewed at these monthly reviews. According to CW-4, the increasing inventory and idle equipment were discussed "all the time" at monthly Foodservice business review meetings in 2025. CW-4 noted that metrics, key performance indicators (KPIs), inventory levels, quality, overall equipment efficiency (OEE) and safety were all also reviewed at monthly Foodservice business review meetings.

### D. Defendants Hid Inventory Issues and Ignored Warnings

86. Beyond mere awareness, Graphic Packaging's leadership, including the Individual Defendants, actively concealed the scope of its operational problems from investors and deliberately disregarded internal warnings to curtail production. While the Defendants publicly

touted Graphic Packaging's performance, in private it was absorbing significant net losses, ignoring the recommendations of its own supply-chain planning systems to reduce production, and maintaining an institutional practice of never shutting down its mills even when output far exceeded demand.

87. CW-3 clarified that Graphic Packaging focused on the optics of winning new business even when the Company lost more business than it won overall. According to CW-3, the Company focused on growing its regional businesses to offset the national business it lost. However, CW-3 recalled that Graphic Packaging lost national business faster than it grew its regional business. CW-3 stated that the goal was to grow its regional business with a focus on innovation and its plastic business.

88. According to CW-3, Graphic Packaging was bullish on its plastic replacement business during quarterly earnings calls. CW-3 stated that the Company's plastic replacement business was supposed to be its "savior." However, CW-3 noted that the plastic replacement business "failed" and "never happened" during his tenure. CW-3 clarified that the innovation group existed after former Senior Vice President of Global Innovation and New Business Ricardo De Genova departed the Company in July 2025 but that the group stopped innovating after De Genova's departure.

89. CW-11 was responsible for deploying a Kinaxis sales and operating planning ("S&OP") system that integrated both supply and demand signals for the Company. CW-11 detailed that phase one of the rollout for this system was to accurately forecast demand for beverage customers, which accounted for approximately 30% of the Company's total annual revenue. According to CW-11, sometime in 2024 the S&OP system informed the Company that it did not need as much beverage supply as it was forcing into the environment based on information

it was fed, but Graphic Packaging ultimately ignored this S&OP system and did not shut down its mills.

90. According to CW-8, the goal for Kinaxis RapidResponse was to automate customer demand planning for the entire Company. CW-8 stated that Graphic Packaging's customer demand planning was "not efficient" and therefore the Company wanted to implement Kinaxis RapidResponse to avoid manufacturing more product than customers purchased. However, CW-8 explained that after piloting Kinaxis, the Company scaled back on the project. CW-8 explained that a few months prior to CW-8's departure in March 2025, Kinaxis RapidResponse told Graphic Packaging to stop manufacturing cartons for Beverage clients based on customer demand forecasts and plant manufacturing details because the Company already manufactured what was forecasted. CW-8 recalled that he attended a meeting with Doss and former Vice President, Supply Chain Planning and Customer Care Paul Myler shortly after Kinaxis RapidResponse told Graphic Packaging to stop manufacturing cartons for Beverage clients, but CW-8 detailed that Doss ignored Kinaxis RapidResponse and told attendees at this meeting to continue running plants and manufacturing cartons for Beverage clients. CW-8 added that Graphic Packaging scrapped the Kinaxis project shortly after this meeting.

91. CW-11 explained that it was Graphic Packaging's "institutional behavior" to never shut down its mills, even when the Company no longer needed to manufacture supply. He detailed that supply teams referenced customer demand forecasts but ignored demand forecasts if those forecasts did not fit the supply team's agenda. CW-11 added that the supply team told him and other members of the demand forecasting team to "find" demand when there was not enough.

92. These confidential witness accounts confirm that Defendants did not merely fail to appreciate the severity of these conditions—Defendants were repeatedly and expressly warned,

yet chose to look the other way. The Company's own Kinaxis sales and operating planning system informed Defendants that production should be curtailed because the Company had already manufactured what customers were forecasted to need, yet Defendant Doss personally overrode that system and directed continued production. When the Kinaxis system's recommendations proved inconvenient, the Company scrapped the project entirely. Monthly financial meetings, quarterly town halls hosted by Defendant Doss himself, and tier-management reviews with the C-Suite all documented the mounting inventory crisis, the declining EBITDA performance at individual plants, and the loss of significant customer accounts, yet Defendants continued to issue public statements projecting confidence, stability, and growth. Taken together, the accounts demonstrate that Defendants acted with conscious indifference to the known risks of their conduct and with reckless disregard for the accuracy of their public disclosures, while the investing public remained in the dark about the true state of the Company's operations and financial condition.

93. In sum, the foregoing facts establish a pervasive pattern of, at minimum, reckless conduct at the highest levels of Graphic Packaging. Throughout 2024 and 2025, Defendants presided over an escalating inventory crisis that spanned across Graphic Packaging's United States facilities—from paper mills and converting plants to specialty operations—while simultaneously assuring the investing public that the Company's business was "strong and steady," that they were matching production to demand, and that the Company's financial outlook remained robust. The facts recounted above demonstrate that this crisis was not the result of unforeseeable market forces, but rather the foreseeable and inevitable consequence of Defendants' own deliberate choices: overstating customer need by as much as 30%; an institutional refusal to curtail production even when facilities were "bursting at the seams" with an unsold product glut; a corporate culture that prioritized hitting production targets over matching output to actual sales orders; and a willingness

to allow major customer accounts—including Chick-fil-A, Nissin Foods, and Burger King—to collapse without disclosing the revenue impact to investors.

### E. Defendants' Wrongdoing Begins to be Revealed

94. The truth began to emerge on May 1, 2025, when Graphic Packaging issued a press release during pre-market hours reporting its Q1 2025 financial results. Among other results, the press release reported Q1 non-GAAP EPS of $0.51, missing consensus estimates by $0.07, and revenue of $2.12 billion, representing a 6% year-over-year decline, and missing consensus estimates by $10 million. The press release also revealed that the Company had negatively revised its previously issued FY 2025 net sales outlook to a range of $8.2 billion to $8.5 billion, significantly down from its prior guidance of $8.7 billion to $8.9 billion; its adjusted EBITDA outlook to a range of $1.4 billion to $1.6 billion, significantly down from its prior guidance of $1.68 billion to $1.78 billion; and its adjusted EPS outlook to a range of $1.75 to $2.25, significantly down from its prior guidance of $2.53 to $2.78. The Company blamed the negatively revised guidance on "an expectation of a 2% volume decline and $80 million of input cost inflation at the midpoint," as well as "higher macroeconomic and consumer spending uncertainty."

95. On the same day, the Defendants conducted an earnings call with investors during which they added additional information to the partial corrective disclosure.

96. In particular, Defendant Doss acknowledged "near-term challenges" and financial results, including margins, that were "significantly below our expectations." Defendant Doss stated, in pertinent part, the following:

> In the first quarter, our business faced considerable pressure, as already stretched consumers pulled back further. Promotional activity by our customers did not drive meaningful volume improvement, and we experienced significant input cost inflation. While these challenges won't be resolved overnight, neither are they long-term in nature. We have taken actions to offset higher costs and continue to generate innovation sales growth that is helping us grow faster than the end markets that we serve.

> Despite near-term challenges, we remain well positioned to generate substantial cash flow in the quarters and years ahead.
>
> In the first quarter, Graphic Packaging sales were $2.1 billion, adjusted EBITDA was $365 million, and margins were 17.2% and adjusted EPS was $0.51. Those results were significantly below our expectations, driven mainly by weaker volumes in the Americas business and broad-based input cost inflation.

97. Nevertheless, Defendant Doss assured investors that the Company "remain[ed] well positioned to generate substantial cash flow[.]

98. In response to analyst questions, Defendant Doss also disclosed that the Company was going to "eliminate some of the inventory," and assured investors that the Defendants were going to "run [the] business to requirement and demand" when asked about "supply demand balance."

99. The foregoing disclosures shocked the market. As reported by RTT News that same morning, Graphic Packaging's stock price had "touched a new 52-week low of $21.16, with volume surging to 8.39 million shares, well above the average of 2.73 million." Seaport Research Partners wrote that "1Q was disappointing but the big surprise was the magnitude of cut to 2025 guidance."

100. On this news, Graphic Packaging's stock price fell $3.94 per share, or 15.57%, to close at $21.37 per share on May 1, 2025. However, this does not reflect a complete disclosure; the market still believed that many of the inventory issues were over. BofA Global Research noted that the Company had shifted from growth to contraction "as it moves from a +2% to -2% (midpt) volume outlook."

### F. Defendants Continue to Mislead Investors by Assuring the Market of Graphic Packaging's Market Position and Ability to Manage Costs, Cash Flow, and Volume

101. Despite the decline in the Company's stock price, Graphic Packaging's common stock continued trading at artificially inflated prices throughout the remainder of the Class Period because of the Defendants' continued misstatements and omissions regarding the strength and sustainability of the Company's business model and operations, its significant inventory glut, and the lack of demand for its products.

102. For example, on May 1, 2025, on an earnings call following the release of financial results, Defendant Doss disclosed that the Company reduced demand and volumes and increased costs but downplayed them by stating that "[w]hile these challenges won't be resolved overnight, neither are they long-term in nature," and that Defendants "have taken actions to offset higher costs and continue to generate innovation sales growth that is helping us grow faster than the end markets we serve." Defendant Doss further represented that, "[d]espite near-term challenges, we remain well positioned to generate substantial cash flow in the quarters and years ahead."

103. During the Q&A phase of the May 1, 2025 Earnings Call, in response to multiple analyst questions regarding volume and inventory, the Individual Defendants indicated that they were capable of actively managing inventory levels to match supply and demand. Defendant Scherger, for example, repeatedly stressed Defendants' focus on matching supply to demand for the year by stating, *inter alia*, that "we are going to run to demand this year," "[we] will be matching supply and demand," and "[w]e will be taking inventory out of the business" and "aggressively matching supply and demand for the remainder of the year[.]"

104. Similarly, on the May 1, 2025 Earnings Call, Defendant Doss stated that "[w]e want to run our business really to demand and making sure that we're running to the requirements that we see in front of us, that'll eliminate some of the inventory[.]"

105. As a result of these statements, the Defendants continued to mislead investors as to the true scope and severity of the Company's inventory glut.

106. On July 29, 2025, Graphic Packaging filed a press release with the SEC on Form 8-K, reporting its second quarter 2025 financial results. The July 29, 2025 press release announced that Graphic Packaging had positively revised the bottom range of its FY 2025 guidance, projecting net sales of at least $8.4 billion, up from Graphic Packaging's prior guidance of at least $8.2 billion; adjusted EBITDA of at least $1.45 billion, up from its prior guidance of at least $1.4 billion; and adjusted EPS of at least $1.90, up from its prior guidance of at least $1.75. The Company cited "actual first half performance and a . . . modest increase in second half revenue expectations" for this positively revised guidance.

107. On July 29, 2025, Graphic Packaging also hosted an earnings call with investors and analysts to discuss its Q2 2025 results. During his prepared remarks on the call, Defendant Doss stated that "[o]ur decision to curtail production to further reduce inventory levels . . . positions us to operate much closer to normal levels in the second half."

108. Similarly, on the July 29, 2025 Earnings Call, Defendant Scherger stated, in relevant part, that Q2 "is our biggest maintenance quarter, and we took aggressive action to manage inventories, which . . . positions us to run at more normal levels in the second half," and that "we expect second half adjusted EBITDA margins to be meaningfully better than first half as a result of actions we have taken to reduce inventories[.]"

109. In response to an analyst's question regarding whether Graphic Packaging's customers were "sitting on comfortable levels of inventory, maybe a little less than the need or more than they need as they go into the back half," Defendant Doss stated, in relevant part, "[O]ur volume [is] obviously quite good this year . . . I can tell you we're busy. We're steady. The demand

is strong. We've gotten no indications from them that it's going to back off before the normal occurrence."

110. On October 9, 2025, Graphic Packaging filed a current report on Form 8-K with the SEC, disclosing that Defendant Scherger was resigning as its EVP and CFO, effective November 7, 2025.

111. On November 4, 2025, Graphic Packaging filed a press release on Form 8-K with the SEC reporting its third quarter 2025 financial results. The November 4, 2025 press release quoted Defendant Doss as stating, in relevant part, the following:

> Against a backdrop of sluggish consumer volumes, we executed well in the quarter, reduced inventory, and saw our innovation engine open new markets for paperboard packaging. As food affordability challenges ease, the full power of our business model and its cash generating potential will become even more apparent.

112. With respect to the Company's financial outlook for FY 2025, the press release stated, in relevant part, the following:

> The Company currently expects full-year 2025 Net Sales, Adjusted EBITDA, and Adjusted EPS, including foreign exchange impact, of $8.4 billion to $8.6 billion, $1.40 billion to $1.45 billion, and $1.80 to $2.00, respectively. Revisions from prior guidance reflect year-to-date performance, further action to match production to orders (~$15 million), and a wider than normal range of potential fourth quarter outcomes. Volume and market uncertainty remain unusually high given a stretched consumer and weakened consumer confidence.

113. On November 4, 2025, Graphic Packaging also hosted a conference call with investors and analysts to discuss its Q3 2025 results. During the conference call, Defendant Doss stated that "[w]e executed well in the quarter, made progress on costs and reduced inventory." During the Q&A phase of the call, in response to an analyst's question regarding the Company's ability to "improve productivity and the like," Defendant Doss represented, in relevant part, that Defendants have "a unique perspective to be able to look at our overall system, look at our supply chains, take a step back and really make sure that we're challenging kind of where we're at and

what we can do," which "are the levers that we really have in our control," and that with respect "to manag[ing] our supply and demand on our coated recycled paperboard," "[w]e're able to do that and we're able to do it cost effectively."

114. Securities analysts became more skeptical of the Company's ability to reduce volume. For example, BofA Global Research downgraded the Company from Buy to Neutral.

115. The truth continued to emerge on December 8, 2025, when Graphic Packaging filed a press release with the SEC on Form 8-K during post-market hours announcing its appointment of Robbert Rietbroek as its new "President and [CEO] and as a director of the Company, effective January 1, 2026" and that Defendant Doss "has mutually agreed with the Graphic Packaging Board of Directors to step down from his role and as a director effective December 31, 2025."

116. The same day, on December 8, 2025, also during post-market hours, Graphic Packaging issued another press release with the SEC on Form 8-K announcing that it was accelerating certain inventory reduction plans earlier than projected, and expected increased costs in connection with the same. Specifically, the December 8, 2025 press release stated:

> [T]he Company plans to accelerate certain inventory reduction plans into [Q4] that were originally planned for 2026. Production curtailment is expected to impact [Q4] operating results by $15 million, which is in addition to the $15 million relating to curtailments announced during [Q3] earnings call.

117. The December 8, 2025 press release also disclosed that Graphic Packaging had, again, negatively revised its FY 2025 financial guidance—specifically, that "[a]djusted EBITDA is now expected to be in the range of $1.338 billion to $1.43 billion (from $1.40 billion to $1.45 billion)" and "[a]djusted EPS is expected to be in the range of $1.75 to $1.95 (from $1.80 to $2.00)."

118. The market reacted swiftly and severely to the foregoing disclosures. As reported by Bloomberg shortly after markets opened the following morning, Graphic Packaging's stock

price had already fallen by more than 8%—the most in seven months—with trading volume spiking to more than seventeen times the 20-day average for that time of day.

119. Multiple market analysts also commented on Defendant Doss's "unexpected" departure and the acceleration of Graphic Packaging's inventory reduction plans. RBC Capital Markets cautioned in its December 8, 2025 report that "[w]e . . . view the management change as somewhat unexpected" and "[a]t the midpoint, GPK's guidance cut reflects a $20M reduction to both Q4 and FY25 EBITDA, which is greater than the $15M EBITDA reduction directly associated with the production curtailment," while concluding that "we think recent management turnover, combined with continued pricing/margin pressure from SBS competitors and a poor demand outlook, creates a degree of uncertainty."

120. Two days later, RBC Capital Markets in its December 10, 2025 report explained that Graphic Packaging's FCF of $700-$800M seemed "aggressive, especially with the $30M of cumulative production headwinds from Q3 & Q4" and expressed that "we think continued potential inventory cuts, pricing headwinds, or poor demand could create downside risk to $500-$600M of FCF."

121. Similarly, Jefferies remarked in its December 8, 2025 report that "GPK unexpectedly announced long-standing CEO, Michael Doss, and the company have agreed to part ways" and Graphic Packaging's "EBITDA cut is mostly driven by $15 mil of incremental actions to accelerate inventory curtailment that were initially planned for 2026."

122. Seaport Research Partners stressed in its December 9, 2025 report that "most surprising to us, GPK announced that Mike Doss is stepping down as President and CEO at year-end." Finally, Wells Fargo Equity Research also commented in its December 8, 2025 analyst report that Doss' departure "create[ed] questions for us [concerning] the abruptness of the turnover."

123. Ultimately, Graphic Packaging's stock price fell $1.35 per share, or 8.66%, to close at $14.23 per share on December 9, 2025.

### G. The Truth Fully Emerges on February 3, 2026

124. Finally, on February 3, 2026, during pre-market hours, Graphic Packaging issued a press release with the SEC on Form 8-K reporting its Q4 and FY 2025 financial results. Among other results, Graphic Packaging reported Q4 non-GAAP EPS of $0.29, missing consensus estimates by $0.06. The Company attributed its disappointing Q4 2025 earning results to lower volumes, increased costs, and inventory reduction, stating, in relevant part:

> [Q4] EBITDA decreased 19% to $305 million, versus $376 million in the same quarter last year. Excluding the impact of business combinations and other non-recurring and special items, Adjusted EBITDA was $311 million versus $404 million in the same quarter last year. The $93 million decline in Adjusted EBITDA was driven primarily by the impact of lower packaging price and volume, commodity and non-commodity costs, and negative Net Performance as a result of decisions taken to curtail production to reduce inventory[.]

125. In the same press release, Graphic Packaging disclosed that it projected a decline in adjusted EBITDA in 2026, citing a $130 million negative impact from actions to reduce inventory and generate free cash flow, stating, in relevant part:

> The Company currently expects . . . Adjusted EBITDA . . . of . . . $1.05 billion to $1.25 billion. . . . The decline in expected Adjusted EBITDA reflects as $130 million negative impact from actions taken to reduce inventory and generate free cash flow, an approximately $100 million accrual (non-cash in 2026) for a return to more normal incentive compensation, January weather and production impacts, and other largely offsetting operating items.

126. As quoted in the same press release, CEO Rietbroek disclosed, in relevant part:

> Consumer affordability created a challenging market for our customers and competitive pressure remains a near-term headwind. As we move into 2026, our priorities are clear: drive operational excellence; deliver exceptional customer service; improve our cost structure; and drive substantial free cash flow to strengthen the balance sheet and return capital to shareholders. I have initiated a comprehensive review of our organization structure, operations, and footprint, and a selective review of our portfolio to ensure that our resources are focused where we can create the greatest value for our shareholders.

127. In addition to the Press Release, Graphic Packaging held an Earnings Call on February 3, 2026 to discuss the Q4 and FY 2025 Financial Results. During that call, Rietbroek admitted that "we need to significantly reduce inventory and ensure that every spending decision brings an appropriate return." Rietbroek also admitted on that call that the Company would have to "remove approximately $260 million of paperboard and finished goods inventory in 2026."

128. The foregoing statements confirmed that, contrary to Defendants' assurances that they maintained "a unique perspective to be able to look at [Graphic Packaging's] overall system" and that they were "matching supply and demand" to eliminate inventory, Defendants misrepresented Graphic Packaging's significant lack of demand and corresponding glut of inventory, concealed their disregard for contradicting demand forecasts, and overstated the Company's ability to meet its financial guidance.

129. Following the foregoing disclosures, Graphic Packaging's stock price fell $2.36 per share, or 15.97%, to close at $12.42 per share on February 3, 2026.

130. The same day, multiple market analysts reacted to Defendants' February 3, 2026 disclosures, indicating surprise and frustration with Graphic Packaging's results. For example, Jefferies wrote that "the quarter & outlook is disappointing and reflects a more competitive backdrop and structural headwinds than appreciated," and that Graphic Packaging "will likely be in the penalty box for some time," citing "negative net performance due to production curtailment to reduce inventory." UBS Global Research characterized the Company's "2026 EBITDA [guidance as] significantly below consensus ($1.15B vs $1.4B)," citing factors related to "inventory reduction." Lastly, Wells Fargo wrote that "[i]nventory reduction will be a profit headwind through at least 2026" and explained that "[w]hile we previously looked past near-term challenges toward 2026 FCF strength, the abrupt CEO change with no direct paper industry

experience, a vacant CFO seat, and still anemic fundamentals shift our view," with "[r]epeated EBITDA guidance cuts and mounting competitive pressure in boxboard further weigh[ing] on confidence in [Company] targets; thus, we assign an UW [underweight] rating."

131. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Lead Plaintiff and other Class members have suffered significant losses and damages.

132. In the aftermath of Graphic Packaging's Q4 and FY 2025 financial results, market analysts covering the Company expressed surprise and confusion over Graphic Packaging's financial condition during the Class Period.

133. Gordon Haskett Research Advisors, on March 5, 2026, highlighted that PricewaterhouseCoopers ("PwC") believed that "GPK [] did not have effective internal control over its financial reporting in 2025," with PwC adding that "'there is a lack of transparency related to certain capital expenditures, which resulted in the Company exceeding the delegation of authority for certain capital projects as well as the annual Board-approved capital expenditure limits.'"

134. Seaport Research Partners, on March 17, 2026, wrote that "there are still unanswered questions to be probed, including more details on strategy and the like, post the management upheaval" and "the EBITDA collapse has made financial leverage look more stretched than we would have anticipated."

135. Paragon Intel, on March 19, 2026, identified Graphic Packaging in its list of "High Risk Companies," citing concerns that "Management consistently avoids providing specific financial bridges, working capital assumptions, and inventory reduction targets."

136. Thus, market analyst sentiment, well after Graphic Packaging's release of its Q4 and FY 2025 financial results, substantiates that the market was not informed or knowledgeable about the Company's swelling volume of aged inventory. Not until Graphic Packaging was forced to reveal that the foregoing issues plagued the Company did investors learn of and react to Graphic Packaging's deteriorating financial state, resulting in substantial losses and damages for investors.

## VII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

137. Congress passed the Exchange Act during the Great Depression, to substitute a philosophy of full disclosure for the then-prevailing philosophy of *caveat emptor* and, thus, to achieve a high standard of business ethics in the securities industry that remains the default rule to this day. The Exchange Act gives rise to liability for false, misleading, and incomplete statements made in connection with the purchase or sale of securities, as well as for fraudulent acts, courses of business, and schemes in connection with the same, to maintain confidence in our public securities markets. It is designed with flexibility in mind, "to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946).

138. To further implement Section 10(b), the SEC promulgated Rule 10b-5(b), which makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

139. During the Class Period, the Defendants made false and misleading statements and omissions in their financial results, quarterly earnings calls, and periodic conferences with investors, all in violation of Section 10(b) and Rule 10b-5(b).

### A. Graphic Packaging's Q4 and FY 2024 Financial Results

140. As detailed below, Graphic Packaging's Q4 and FY 2024 Financial Results, issued on February 4, 2025 with the SEC on Form 8-K before the market opened, affirmatively misrepresented the Company's strength in the market and contained untrue statements of material facts and/or omitted to state other facts necessary to make the statements therein not misleading. Specifically, they included the following false and misleading statements.

#### 1. Misstatement No. 1—Q4 and FY 2024 Financial Results

141. Q4 and FY 2024 Financial Results sought to assure investors about demand for Graphic Packaging's products by telling them that "***[c]ustomer destocking is largely over***," *i.e.*, that Graphic Packaging's customers had reduced their packaging inventory and are now buying more packaging than in the past. The Q4 and FY 2024 Financial Results stated, in pertinent part, the following:

> The past two years have presented unusual volume challenges for the industry and our customers. ***Customer destocking is largely over***, but consumers are stretched and searching for value in their everyday purchases. Across grocery, convenience, e-commerce and mass retail, Graphic Packaging is responding to our customers' evolving needs by creating the more circular, more functional, and more convenient packaging that consumers prefer. As the last of our major asset investments comes to completion in 2025, capital spending will decline significantly, and we will deploy excess cash to create substantial value for our stockholders.

142. Misstatement No. 1 was materially false and misleading when made because customer destocking was not "largely over;" rather, demand for Graphic Packaging's products was collapsing, major customer accounts had been lost, and the Company's facilities were overwhelmed with historically high levels of unsold product. Misstatement No. 1 also failed to disclose that:

(a) Facilities across the Company's nationwide network were overwhelmed with historically high levels of unsold product, and as a result, plants were at full capacity, facilities

were running out of warehouse space, the Company was forced to rent hundreds of thousands of square feet of additional storage, and some facilities were warehousing trailers of excess product in parking lots;

(b) The Company's own Kinaxis demand planning system—which was implemented specifically to match customer demand with production—expressly warned that production of all beverage products should be curtailed because the Company had already manufactured what customers needed, yet Defendant Doss personally overrode those warnings and ordered continued production, and the Company subsequently scrapped the Kinaxis system, eliminating the system that was providing accurate demand forecasts that contradicted Defendants' preferred narrative;

(c) The Company had an institutional practice of never shutting down its mills regardless of demand, and the Company's supply teams ignored demand forecasts that did not support continued production;

(d) The Company had lost major customer accounts, including the Chick-fil-A cold cup project, the Nissin Foods instant noodle cup project, and the Burger King 27-ounce cup project, and the Company's sales team was unable to replace the lost business;

(e) The Company was experiencing a broad erosion of customer demand—losing national business faster than it could grow its regional business, watching smaller replacement customers leave the Company in 2025, and witnessing the failure of the Company's plastic replacement business;

(f) Monthly financial meetings, quarterly town halls hosted by Defendant Doss (at which he presented month-over-month aged inventory charts and told attendees that the Company had millions of dollars of boxes sitting in aged inventory), and tier-management reviews

(at which the C-Suite met with division leaders to review all data and metrics) all documented the mounting inventory crisis;

(g) The Company's 2025 production exceeded demand by approximately 30% according to the Company's own internal MAPE calculation; and

(h) As a result of the foregoing, Defendants' representations were materially misleading, as they concealed a severe and persistent inventory crisis driven by deliberate overproduction, artificially inflated demand conditions, the permanent loss of major customer accounts, and the structural deterioration of the Company's operations and financial condition.

**B. Graphic Packaging's Q4 and FY 2024 Earnings Call**

143. As detailed below, Graphic Packaging's Q4 and FY 2024 Earnings Call, held on February 4, 2025 during normal market hours, affirmatively misrepresented the Company's strength in the market and contained untrue statements of material facts and/or omitted to state other facts necessary to make the statements therein not misleading. Specifically, it included the following false and misleading statements.

**1. Misstatement No. 2—Q4 and FY 2024 Earnings Call**

144. During the Q4 and FY 2024 Earnings Call, Defendant Doss reassured investors that the Company's business was sound by telling them that Graphic Packaging was "***well positioned for 2025***" and that the Company had "***buil[t] a consumer packaging business capable of generating strong and steady margins and cash flow across a variety of market environments.***" Defendant Doss stated, in pertinent part, the following:

> In 2024, we demonstrated the strength of our business model, delivering strong and steady margins in challenging market conditions. ***We are well-positioned for 2025*** and to meet our Vision 2030 aspirations in the years ahead.
>
> ***
>
> ***Our team has done an outstanding job executing at a high level to build a consumer packaging business capable of generating strong and steady margins and cash flow across a variety of market environments.***

145. Misstatement No. 2 was materially false and misleading when made because the Company was not "well-positioned for 2025" and its current business model was not "capable of generating strong and steady margins and cash flows;" rather, the Company was overwhelmed with historically high levels of unsold product, major customer accounts were being cancelled, and the Company's Kinaxis system was warning that production should be curtailed. Misstatement No. 2 also failed to disclose that:

(a) Facilities across the Company's nationwide network were overwhelmed with historically high levels of unsold product, and as a result, plants were at full capacity, facilities were running out of warehouse space, the Company was forced to rent hundreds of thousands of square feet of additional storage, and some facilities were warehousing trailers of excess product in parking lots;

(b) The Company's own Kinaxis demand planning system—which was implemented specifically to match customer demand with production—expressly warned that production of all beverage products should be curtailed because the Company had already manufactured what customers needed, yet Defendant Doss personally overrode those warnings and ordered continued production, and the Company subsequently scrapped the Kinaxis system, eliminating the system that was providing accurate demand forecasts that contradicted Defendants' preferred narrative;

(c) The Company had an institutional practice of never shutting down its mills regardless of demand, and the Company's supply teams ignored demand forecasts that did not support continued production;

(d) The Company had lost major customer accounts, including the Chick-fil-A cold cup project, the Nissin Foods instant noodle cup project, and the Burger King 27-ounce cup project, and the Company's sales team was unable to replace the lost business;

(e) The Company was experiencing a broad erosion of customer demand—losing national business faster than it could grow its regional business, watching smaller replacement customers leave the Company in 2025, and witnessing the failure of the Company's plastic replacement business;

(f) Monthly financial meetings, quarterly town halls hosted by Defendant Doss (at which he presented month-over-month aged inventory charts and told attendees that the Company had millions of dollars of boxes sitting in aged inventory), and tier-management reviews (at which the C-Suite met with division leaders to review all data and metrics) all documented the mounting inventory crisis;

(g) The Company's 2025 production exceeded demand by approximately 30% according to the Company's own internal MAPE calculation; and

(h) As a result of the foregoing, Defendants' representations were materially misleading, as they concealed a severe and persistent inventory crisis driven by deliberate overproduction, artificially inflated demand conditions, the permanent loss of major customer accounts, and the structural deterioration of the Company's operations and financial condition.

**2. Misstatement No. 3—Q4 and FY 2024 Earnings Call**

146. Also during the Q4 and FY 2024 Earnings Call, Defendant Scherger downplayed some volume challenges and assured investors that the Company's profitability remained intact with "***strong and steady margins.***" Defendant Scherger stated, in pertinent part, the following:

> ***Despite a broad-based customer and retailer destocking and consumers under pressure from inflation, both of which reduced our volumes, we are generating***

> ***appropriate value for the packages we deliver, and that is translating into strong and steady margins.***
>
> ***
>
> Given the volume challenges our customers are facing, the bottom of our 2025 adjusted EBITDA range assumes a year, not very different from the one we just ended. Even at that level, margins would be in the 19% range, which again speaks to the strength of the business model.

147. Misstatement No. 3 was materially false and misleading when made because the "strong and steady margins" Defendant Scherger touted were being sustained by continued overproduction that deferred expense recognition, and that overproduction was fueling the undisclosed inventory glut at the Company. Misstatement No. 3 also failed to disclose that:

(a) Facilities across the Company's nationwide network were overwhelmed with historically high levels of unsold product, and as a result, plants were at full capacity, facilities were running out of warehouse space, the Company was forced to rent hundreds of thousands of square feet of additional storage, and some facilities were warehousing trailers of excess product in parking lots;

(b) The Company's own Kinaxis demand planning system—which was implemented specifically to match customer demand with production—expressly warned that production of all beverage products should be curtailed because the Company had already manufactured what customers needed, yet Defendant Doss personally overrode those warnings and ordered continued production, and the Company subsequently scrapped the Kinaxis system, eliminating the system that was providing accurate demand forecasts that contradicted Defendants' preferred narrative;

(c) The Company had an institutional practice of never shutting down its mills regardless of demand, and the Company's supply teams ignored demand forecasts that did not support continued production;

(d) The Company had lost major customer accounts, including the Chick-fil-A cold cup project, the Nissin Foods instant noodle cup project, and the Burger King 27-ounce cup project, and the Company's sales team was unable to replace the lost business;

(e) The Company was experiencing a broad erosion of customer demand—losing national business faster than it could grow its regional business, watching smaller replacement customers leave the Company in 2025, and witnessing the failure of the Company's plastic replacement business;

(f) Monthly financial meetings, quarterly town halls hosted by Defendant Doss (at which he presented month-over-month aged inventory charts and told attendees that the Company had millions of dollars of boxes sitting in aged inventory), and tier-management reviews (at which the C-Suite met with division leaders to review all data and metrics) all documented the mounting inventory crisis;

(g) The Company's 2025 production exceeded demand by approximately 30% according to the Company's own internal MAPE calculation; and

(h) As a result of the foregoing, Defendants' representations were materially misleading, as they concealed a severe and persistent inventory crisis driven by deliberate overproduction, artificially inflated demand conditions, the permanent loss of major customer accounts, and the structural deterioration of the Company's operations and financial condition.

**3. Misstatement No. 4—Q4 and FY 2024 Earnings Call**

148. Also during the Q4 and FY 2024 Earnings Call, Defendant Doss, in response to an analyst's question, explained away any elevation of the Company's inventory levels by attributing them to the upcoming Waco mill startup, representing that inventory would "***wash through pretty quickly***" once Waco came online and assuring investors that the Defendants had their "eye on"

inventory levels. Defendant Doss's and the analyst's exchange, in pertinent part, was the following:

> [Analyst:] I had a question about inventory levels. And I'm looking at inventory days that have kind of jumped up since 2018. And I suspect part of that might be related to the cups business maybe holding a little bit more inventory for QSR to make sure that they have what they need. But it also kicked up a little bit in 2023 and 2024. I'm just curious if there's anything that's intentional, number one?
>
> And then number two, on the production side, the paper side or maybe folding cartons, I don't suspect you guys are holding a whole lot of inventory there. What that might imply for your own operating rates in 2025, meaning it matched up with what you expect to be kind of 2%-ish volume rates?
>
> [Defendant Doss:] ***Yeah. Your read is good . . . . [I]n some cases, we did have inventories that were a bit depleted coming out of the rush through the pandemic, if you will. And so our customers wanted us to get those back to the contracted levels, which we've done.***
>
> ***The biggest impact on a year-over-year basis is planning we're already doing to get ready for the Waco start up. As you can appreciate, we've got a couple of paperboard manufacturing facilities that we need to take down and one we need to start up. So, we have to make sure we protect our customers during that process.***
>
> ***You'll see that wash through pretty quickly as Waco comes online. We expect to harvest that working capital. It's something we've got an [eye on],[7] we want to normalize our paperboard and the levels that we have. But when you're going through a big start-up like that, you've got to make sure that you cover for some of the contingencies. That's what we're doing.***

149. Misstatement No. 4 was materially false and misleading when made because the scope of the Company's inventory crisis was not limited to the Waco mill transition, nor was it a transient byproduct of the Waco mill transition that would "wash through pretty quickly;" rather, the Company's undisclosed inventory crisis was a pervasive, systemwide problem driven by sustained overproduction across dozens of facilities in the face of collapsing customer demand,

[7] The transcript for the Q4 and FY2024 Earnings Call has a transcription error and reads "ion" instead of "eye on."

unrelated to and not resolvable by the Waco startup. Misstatement No. 4 also failed to disclose that:

(a) Facilities across the Company's nationwide network were overwhelmed with historically high levels of unsold product, and as a result, plants were at full capacity, facilities were running out of warehouse space, the Company was forced to rent hundreds of thousands of square feet of additional storage, and some facilities were warehousing trailers of excess product in parking lots;

(b) The Company's own Kinaxis demand planning system—which was implemented specifically to match customer demand with production—expressly warned that production of all beverage products should be curtailed because the Company had already manufactured what customers needed, yet Defendant Doss personally overrode those warnings and ordered continued production, and the Company subsequently scrapped the Kinaxis system, eliminating the system that was providing accurate demand forecasts that contradicted Defendants' preferred narrative;

(c) The Company had an institutional practice of never shutting down its mills regardless of demand, and the Company's supply teams ignored demand forecasts that did not support continued production;

(d) The Company had lost major customer accounts, including the Chick-fil-A cold cup project, the Nissin Foods instant noodle cup project, and the Burger King 27-ounce cup project, and the Company's sales team was unable to replace the lost business;

(e) The Company was experiencing a broad erosion of customer demand—losing national business faster than it could grow its regional business, watching smaller

replacement customers leave the Company in 2025, and witnessing the failure of the Company's plastic replacement business;

(f) Monthly financial meetings, quarterly town halls hosted by Defendant Doss (at which he presented month-over-month aged inventory charts and told attendees that the Company had millions of dollars of boxes sitting in aged inventory), and tier-management reviews (at which the C-Suite met with division leaders to review all data and metrics) all documented the mounting inventory crisis;

(g) The Company's 2025 production exceeded demand by approximately 30% according to the Company's own internal MAPE calculation; and

(h) As a result of the foregoing, Defendants' representations were materially misleading, as they concealed a severe and persistent inventory crisis driven by deliberate overproduction, artificially inflated demand conditions, the permanent loss of major customer accounts, and the structural deterioration of the Company's operations and financial condition.

**4. Misstatement No. 5—Q4 and FY 2024 Earnings Call**

150. Also during the Q4 and FY 2024 Earnings Call, in another exchange with an analyst, Defendant Doss continued to minimize any inventory issues at the Company by characterizing any increase in inventory as a deliberate, limited decision to "***build a little bit of paperboard inventory***" in preparation for the Waco startup, and assured investors that "***we like where we're at with our finished goods***" inventory. Defendant Doss's and the analyst's exchange, in pertinent part, was the following:

> [Analyst:] I guess the first question, going back to the inventory side. So it looks like you took quite a bit of action over the last half year. So I know there was some downtime. There was also some downtime a year ago in the second half.
>
> So, I guess as it stands, would you say that your inventories are balanced where you want to be, or is there still some more work to bring those down? And you also, I

> think, built some inventory ahead of the Augusta closure. So maybe you can just update us on that first.
>
> [Defendant Doss:] Yeah. So, as I kind of mentioned there . . . we had some rebuilding we needed to do with our finished goods coming through the pandemic. We've done that. We have to be able to service our customers in a highly variable market. We feel good about where we're at. Our on-time delivery is very high, and we're servicing them very well.
>
> As I mentioned, ***we made a decision to build a little bit of paperboard inventory here as we prepare for start-up of the Waco paperboard mill. But, as I mentioned earlier in my comments, that will wash through pretty quickly as we bring that mill up and running.***
>
> ***So by and large, we like where we're at with our finished goods . . . [I]t's a balance to make sure that we're able to respond to customer needs in a highly variable market.***

151. Misstatement No. 5 was materially false and misleading when made because excess inventory at the Company was not limited to "a little bit of paperboard" built in preparation for the Waco start-up; rather, the Company had significant excess inventory across dozens of facilities spanning multiple product lines and geographic regions, driven by companywide overproduction, the loss of major customer accounts, and dropping demand, none of which related to the Waco transition. Misstatement No. 5 also failed to disclose that:

(a) Facilities across the Company's nationwide network were overwhelmed with historically high levels of unsold product, and as a result, plants were at full capacity, facilities were running out of warehouse space, the Company was forced to rent hundreds of thousands of square feet of additional storage, and some facilities were warehousing trailers of excess product in parking lots;

(b) The Company's own Kinaxis demand planning system—which was implemented specifically to match customer demand with production—expressly warned that production of all beverage products should be curtailed because the Company had already

manufactured what customers needed, yet Defendant Doss personally overrode those warnings and ordered continued production, and the Company subsequently scrapped the Kinaxis system, eliminating the system that was providing accurate demand forecasts that contradicted Defendants' preferred narrative;

(c) The Company had an institutional practice of never shutting down its mills regardless of demand, and the Company's supply teams ignored demand forecasts that did not support continued production;

(d) The Company had lost major customer accounts, including the Chick-fil-A cold cup project, the Nissin Foods instant noodle cup project, and the Burger King 27-ounce cup project, and the Company's sales team was unable to replace the lost business;

(e) The Company was experiencing a broad erosion of customer demand—losing national business faster than it could grow its regional business, watching smaller replacement customers leave the Company in 2025, and witnessing the failure of the Company's plastic replacement business;

(f) Monthly financial meetings, quarterly town halls hosted by Defendant Doss (at which he presented month-over-month aged inventory charts and told attendees that the Company had millions of dollars of boxes sitting in aged inventory), and tier-management reviews (at which the C-Suite met with division leaders to review all data and metrics) all documented the mounting inventory crisis;

(g) The Company's 2025 production exceeded demand by approximately 30% according to the Company's own internal MAPE calculation; and

(h) As a result of the foregoing, Defendants' representations were materially misleading, as they concealed a severe and persistent inventory crisis driven by deliberate

overproduction, artificially inflated demand conditions, the permanent loss of major customer accounts, and the structural deterioration of the Company's operations and financial condition.

### C. February 27, 2025 Bank of America Global Agricultural and Materials Conference

152. On February 27, 2025, Defendants attended the Bank of America Global Agricultural and Materials Conference (the "BofA Conference") and disseminated to investors similar misrepresentations and omissions present in the Company's Q4 and FY 2024 Financial Results. Specifically, Defendants made the following materially false and misleading statements and omissions.

#### 1. Misstatement No. 6—BofA Conference

153. During the BofA Conference, Defendant Scherger conveyed to investors that Graphic Packaging's profitability was the product of sound business execution, representing that the Company's "***margin stability in that 19-plus-percentage range has been exceptionally high***," and once again described customer "***destocking***" as being in the past. Defendant Scherger stated, in pertinent part, the following:

> Margin stability has been absolutely critical for us as we've built this business, getting paid appropriately for the packages that we made, controlling our costs in ways that work effectively and being compensated appropriately for the value of the product, the value of the package. ***So, in the last couple of years, in some pretty challenging volume environments, managing through post COVID, managing through supply chain, disruptions, destocking, and then of course, a return to modest growth here in 2024. Our margin stability in that 19-plus-percent range has been exceptionally high and it's critical.*** Because it's that margin stability that allows us to invest back in the business and also allows us to really turn on the cash flow engine, which we'll start to commence very intensely as we bring our Waco coated recycled paperboard investment to life later this year.

154. Misstatement No. 6 was materially false and misleading when made because the "exceptionally high" margin stability Defendants touted did not reflect genuine operational strength, and the destocking was not in the past; rather, the Company's facilities were

overwhelmed with unsold product, demand had declined, and the Company's own Kinaxis system warned that production should be curtailed. Misstatement No. 6 also failed to disclose that:

(a) Facilities across the Company's nationwide network were overwhelmed with historically high levels of unsold product, and as a result, plants were at full capacity, facilities were running out of warehouse space, the Company was forced to rent hundreds of thousands of square feet of additional storage, and some facilities were warehousing trailers of excess product in parking lots;

(b) The Company's own Kinaxis demand planning system—which was implemented specifically to match customer demand with production—expressly warned that production of all beverage products should be curtailed because the Company had already manufactured what customers needed, yet Defendant Doss personally overrode those warnings and ordered continued production, and the Company subsequently scrapped the Kinaxis system, eliminating the system that was providing accurate demand forecasts that contradicted Defendants' preferred narrative;

(c) The Company had an institutional practice of never shutting down its mills regardless of demand, and the Company's supply teams ignored demand forecasts that did not support continued production;

(d) The Company had lost major customer accounts, including the Chick-fil-A cold cup project, the Nissin Foods instant noodle cup project, and the Burger King 27-ounce cup project, and the Company's sales team was unable to replace the lost business;

(e) The Company was experiencing a broad erosion of customer demand—losing national business faster than it could grow its regional business, watching smaller

replacement customers leave the Company in 2025, and witnessing the failure of the Company's plastic replacement business;

(f) Monthly financial meetings, quarterly town halls hosted by Defendant Doss (at which he presented month-over-month aged inventory charts and told attendees that the Company had millions of dollars of boxes sitting in aged inventory), and tier-management reviews (at which the C-Suite met with division leaders to review all data and metrics) all documented the mounting inventory crisis;

(g) The Company's 2025 production exceeded demand by approximately 30% according to the Company's own internal MAPE calculation; and

(h) As a result of the foregoing, Defendants' representations were materially misleading, as they concealed a severe and persistent inventory crisis driven by deliberate overproduction, artificially inflated demand conditions, the permanent loss of major customer accounts, and the structural deterioration of the Company's operations and financial condition.

### D. Graphic Packaging Q1 2025 Financial Results

155. On May 1, 2025, the Company filed its Q1 2025 Financial Results before the market opened. This filing contained the Company's first major guidance cut.

#### 1. Misstatement No. 7—Q1 2025 Earnings Call

156. On May 1, 2025, during regular market hours, Defendants Doss and Scherger conducted the Q1 2025 Earnings Call with investors to discuss the Company's Q1 2025 Financial Results.

157. During the Q1 2025 Earnings Call following the guidance cut, Defendant Doss told investors that the Company's challenges were temporary and manageable and that the Company remained well-positioned. Defendant Doss explained, "[w]hile these challenges won't be resolved overnight, ***neither are they long-term in nature***," and that Defendants "***have taken actions to***

***offset higher costs and continue to generate innovation sales growth that is helping us grow faster than the end markets we serve.*** " Defendant Doss further represented that, "[d]espite near-term challenges, ***we remain well positioned to generate substantial cash flow in the quarters and years ahead.*** "

158. Misstatement No. 7 was materially false and misleading when made because the Company's challenges were not transient; rather, they were structural and companywide, driven by overproduction that Individual Defendants knew of or were reckless in disregarding and had been personally perpetuated by Defendant Doss overriding the Kinaxis system's express warning to reduce production, as well as the permanent loss of major customer accounts and lack of customer demand. Misstatement No. 7 also failed to disclose that:

(a) Facilities across the Company's nationwide network were overwhelmed with historically high levels of unsold product, and as a result, plants were at full capacity, facilities were running out of warehouse space, the Company was forced to rent hundreds of thousands of square feet of additional storage, and some facilities were warehousing trailers of excess product in parking lots;

(b) The Company's own Kinaxis demand planning system—which was implemented specifically to match customer demand with production—expressly warned that production of all beverage products should be curtailed because the Company had already manufactured what customers needed, yet Defendant Doss personally overrode those warnings and ordered continued production, and the Company subsequently scrapped the Kinaxis system, eliminating the system that was providing accurate demand forecasts that contradicted Defendants' preferred narrative;

(c) The Company had an institutional practice of never shutting down its mills regardless of demand, and the Company's supply teams ignored demand forecasts that did not support continued production;

(d) The Company had lost major customer accounts, including the Chick-fil-A cold cup project, the Nissin Foods instant noodle cup project, and the Burger King 27-ounce cup project, and the Company's sales team was unable to replace the lost business;

(e) The Company was experiencing a broad erosion of customer demand—losing national business faster than it could grow its regional business, watching smaller replacement customers leave the Company in 2025, and witnessing the failure of the Company's plastic replacement business;

(f) Monthly financial meetings, quarterly town halls hosted by Defendant Doss (at which he presented month-over-month aged inventory charts and told attendees that the Company had millions of dollars of boxes sitting in aged inventory), and tier-management reviews (at which the C-Suite met with division leaders to review all data and metrics) all documented the mounting inventory crisis;

(g) The Company's 2025 production exceeded demand by approximately 30% according to the Company's own internal MAPE calculation; and

(h) As a result of the foregoing, Defendants' representations were materially misleading, as they concealed a severe and persistent inventory crisis driven by deliberate overproduction, artificially inflated demand conditions, the permanent loss of major customer accounts, and the structural deterioration of the Company's operations and financial condition.

### 2. Misstatement No. 8—Q1 2025 Earnings Call

159. Also during that same Q1 2025 Earnings Call, Defendant Doss, in response to an analyst's question, assured investors that the Company's production decisions were driven by actual customer demand. Defendant Doss stated, in pertinent part, the following:

> ***[W]e want to run our business really to demand and making sure that we're running to the requirements that we see in front of us, that'll eliminate some of the inventory[.]***

160. Misstatement No. 8 was materially false and misleading when made because Defendants were not running the business "to demand;" rather, Defendant Doss had personally overridden the Company's Kinaxis system when it warned that production should stop, plants were manufacturing product far in excess of actual sales orders, and the Company had an institutional practice of never shutting down its mills regardless of demand. Misstatement No. 8 also failed to disclose that:

(a) Facilities across the Company's nationwide network were overwhelmed with historically high levels of unsold product, and as a result, plants were at full capacity, facilities were running out of warehouse space, the Company was forced to rent hundreds of thousands of square feet of additional storage, and some facilities were warehousing trailers of excess product in parking lots;

(b) The Company's own Kinaxis demand planning system—which was implemented specifically to match customer demand with production—expressly warned that production of all beverage products should be curtailed because the Company had already manufactured what customers needed, yet Defendant Doss personally overrode those warnings and ordered continued production, and the Company subsequently scrapped the Kinaxis system, eliminating the system that was providing accurate demand forecasts that contradicted Defendants' preferred narrative;

(c) The Company had an institutional practice of never shutting down its mills regardless of demand, and the Company's supply teams ignored demand forecasts that did not support continued production;

(d) The Company had lost major customer accounts, including the Chick-fil-A cold cup project, the Nissin Foods instant noodle cup project, and the Burger King 27-ounce cup project, and the Company's sales team was unable to replace the lost business;

(e) The Company was experiencing a broad erosion of customer demand—losing national business faster than it could grow its regional business, watching smaller replacement customers leave the Company in 2025, and witnessing the failure of the Company's plastic replacement business;

(f) Monthly financial meetings, quarterly town halls hosted by Defendant Doss (at which he presented month-over-month aged inventory charts and told attendees that the Company had millions of dollars of boxes sitting in aged inventory), and tier-management reviews (at which the C-Suite met with division leaders to review all data and metrics) all documented the mounting inventory crisis;

(g) The Company's 2025 production exceeded demand by approximately 30% according to the Company's own internal MAPE calculation; and

(h) As a result of the foregoing, Defendants' representations were materially misleading, as they concealed a severe and persistent inventory crisis driven by deliberate overproduction, artificially inflated demand conditions, the permanent loss of major customer accounts, and the structural deterioration of the Company's operations and financial condition.

**3. Misstatement No. 9—Q1 2025 Earnings Call**

161. Also during the Q1 2025 Earnings Call, Defendant Scherger, in response to an analyst's question, assured investors that Defendants focused on supply and demand, representing

that "we are going to ***run to demand this year. It will be matching supply and demand. We will be taking inventory out of the business***" and "***aggressively matching supply and demand for the remainder of the year[.]***"

162. Misstatement No. 9 was materially false and misleading when made because the Company was neither "matching supply and demand" nor "aggressively" doing so; rather, facilities across the Company were overwhelmed with unsold product, Defendant Doss had personally overridden the Company's Kinaxis system when it warned that production should stop, and the Company's supply teams were ignoring demand forecasts. Misstatement No. 9 also failed to disclose that:

(a) Facilities across the Company's nationwide network were overwhelmed with historically high levels of unsold product, and as a result, plants were at full capacity, facilities were running out of warehouse space, the Company was forced to rent hundreds of thousands of square feet of additional storage, and some facilities were warehousing trailers of excess product in parking lots;

(b) The Company's own Kinaxis demand planning system—which was implemented specifically to match customer demand with production—expressly warned that production of all beverage products should be curtailed because the Company had already manufactured what customers needed, yet Defendant Doss personally overrode those warnings and ordered continued production, and the Company subsequently scrapped the Kinaxis system, eliminating the system that was providing accurate demand forecasts that contradicted Defendants' preferred narrative;

(c) The Company had an institutional practice of never shutting down its mills regardless of demand, and the Company's supply teams ignored demand forecasts that did not support continued production;

(d) The Company had lost major customer accounts, including the Chick-fil-A cold cup project, the Nissin Foods instant noodle cup project, and the Burger King 27-ounce cup project, and the Company's sales team was unable to replace the lost business;

(e) The Company was experiencing a broad erosion of customer demand—losing national business faster than it could grow its regional business, watching smaller replacement customers leave the Company in 2025, and witnessing the failure of the Company's plastic replacement business;

(f) Monthly financial meetings, quarterly town halls hosted by Defendant Doss (at which he presented month-over-month aged inventory charts and told attendees that the Company had millions of dollars of boxes sitting in aged inventory), and tier-management reviews (at which the C-Suite met with division leaders to review all data and metrics) all documented the mounting inventory crisis;

(g) The Company's 2025 production exceeded demand by approximately 30% according to the Company's own internal MAPE calculation; and

(h) As a result of the foregoing, Defendants' representations were materially misleading, as they concealed a severe and persistent inventory crisis driven by deliberate overproduction, artificially inflated demand conditions, the permanent loss of major customer accounts, and the structural deterioration of the Company's operations and financial condition.

**4. Misstatement No. 10—Q1 2025 Earnings Call**

163. Also during the Q1 2025 Earnings Call, Defendant Scherger, in response to an analyst's question, reassured investors that the Company was "***being very aggressive about cash***

***flow generation***" and that "***[i]nventory will be going down as the year plays itself out.***" Defendant Scherger stated, in pertinent part, the following:

> [O]ur long-term confidence in those cash flows remains very high. The leap-off point coming out of 2025 into 2026, modestly below that. But as Mike was mentioning earlier, ***we're being very aggressive about cash flow generation this year. Inventory will be going down as the year plays itself out.*** So actual cash flow generation this year is going to be really at or above where we originally had expected it. It's just we're getting there with a little different EBITDA outcome given the challenges our customers are facing volumetrically.

164. Misstatement No. 10 was materially false and misleading when made because Defendant Scherger's assurance of "aggressive" cash flow generation and declining inventory was contradicted by the Company's ongoing overproduction and inventory glut, lack of customer demand, loss of major customer accounts, and internal meetings documenting escalating inventory levels and declining plant-level EBITDA. Misstatement No. 10 also failed to disclose that:

(a) Facilities across the Company's nationwide network were overwhelmed with historically high levels of unsold product, and as a result, plants were at full capacity, facilities were running out of warehouse space, the Company was forced to rent hundreds of thousands of square feet of additional storage, and some facilities were warehousing trailers of excess product in parking lots;

(b) The Company's own Kinaxis demand planning system—which was implemented specifically to match customer demand with production—expressly warned that production of all beverage products should be curtailed because the Company had already manufactured what customers needed, yet Defendant Doss personally overrode those warnings and ordered continued production, and the Company subsequently scrapped the Kinaxis system, eliminating the system that was providing accurate demand forecasts that contradicted Defendants' preferred narrative;

(c) The Company had an institutional practice of never shutting down its mills regardless of demand, and the Company's supply teams ignored demand forecasts that did not support continued production;

(d) The Company had lost major customer accounts, including the Chick-fil-A cold cup project, the Nissin Foods instant noodle cup project, and the Burger King 27-ounce cup project, and the Company's sales team was unable to replace the lost business;

(e) The Company was experiencing a broad erosion of customer demand—losing national business faster than it could grow its regional business, watching smaller replacement customers leave the Company in 2025, and witnessing the failure of the Company's plastic replacement business;

(f) Monthly financial meetings, quarterly town halls hosted by Defendant Doss (at which he presented month-over-month aged inventory charts and told attendees that the Company had millions of dollars of boxes sitting in aged inventory), and tier-management reviews (at which the C-Suite met with division leaders to review all data and metrics) all documented the mounting inventory crisis;

(g) The Company's 2025 production exceeded demand by approximately 30% according to the Company's own internal MAPE calculation; and

(h) As a result of the foregoing, Defendants' representations were materially misleading, as they concealed a severe and persistent inventory crisis driven by deliberate overproduction, artificially inflated demand conditions, the permanent loss of major customer accounts, and the structural deterioration of the Company's operations and financial condition.

**E. June 11, 2025 Wells Fargo Industrials Conference**

165. Defendant Scherger, while attending the June 11, 2025 Wells Fargo Industrial Conference (the "WF Conference"), disseminated additional misrepresentations and omissions

regarding the Company's financial strength, further misleading investors concerning the state and affairs of Graphic Packaging. Specifically, Scherger offered the following false and misleading statements.

**1. Misstatement No. 11—WF Conference**

166. During the WF Conference, Defendant Scherger conveyed to investors that the Company's was "***well-positioned on inventory reduction***," "***aggressive[ly] . . . tak[ing] inventory out of the business***," and "***able to run [production] quite full for the rest of the year***." Defendant Scherger stated, in pertinent part, the following:

> ***[W]e're being very aggressive to take inventory out of the business, match—have our production be at or below our demand such that our expectation***, we typically don't guide for the quarter. But our expectation for the quarter, EBITDA in the $330 million to $340 million range. ***Well-positioned on inventory reductions such that we'll be able to run actually quite full with the majority of our maintenance downtime behind us in the first half and in a position to drive inventory out of the business for the remainder of the year with Middletown closure behind us. And be able to run quite full for the rest of the year, which gives us confidence in our full-year guide***.

167. Misstatement No. 11 was materially false and misleading when made because the Company was not "aggressive[ly] . . . tak[ing ]inventory out of the business," nor was it "well-positioned on inventory reductions;" rather, inventory levels were at historic highs across the Company and would remain so throughout the Class Period. Misstatement No. 11 also failed to disclose that:

(a) Facilities across the Company's nationwide network were overwhelmed with historically high levels of unsold product, and as a result, plants were at full capacity, facilities were running out of warehouse space, the Company was forced to rent hundreds of thousands of square feet of additional storage, and some facilities were warehousing trailers of excess product in parking lots;

(b) The Company's own Kinaxis demand planning system—which was implemented specifically to match customer demand with production—expressly warned that production of all beverage products should be curtailed because the Company had already manufactured what customers needed, yet Defendant Doss personally overrode those warnings and ordered continued production, and the Company subsequently scrapped the Kinaxis system, eliminating the system that was providing accurate demand forecasts that contradicted Defendants' preferred narrative;

(c) The Company had an institutional practice of never shutting down its mills regardless of demand, and the Company's supply teams ignored demand forecasts that did not support continued production;

(d) The Company had lost major customer accounts, including the Chick-fil-A cold cup project, the Nissin Foods instant noodle cup project, and the Burger King 27-ounce cup project, and the Company's sales team was unable to replace the lost business;

(e) The Company was experiencing a broad erosion of customer demand—losing national business faster than it could grow its regional business, watching smaller replacement customers leave the Company in 2025, and witnessing the failure of the Company's plastic replacement business;

(f) Monthly financial meetings, quarterly town halls hosted by Defendant Doss (at which he presented month-over-month aged inventory charts and told attendees that the Company had millions of dollars of boxes sitting in aged inventory), and tier-management reviews (at which the C-Suite met with division leaders to review all data and metrics) all documented the mounting inventory crisis;

(g) The Company's 2025 production exceeded demand by approximately 30% according to the Company's own internal MAPE calculation; and

(h) As a result of the foregoing, Defendants' representations were materially misleading, as they concealed a severe and persistent inventory crisis driven by deliberate overproduction, artificially inflated demand conditions, the permanent loss of major customer accounts, and the structural deterioration of the Company's operations and financial condition.

**2. Misstatement No. 12—WF Conference**

168. Also during the WF Conference, Defendant Scherger, in response to an analyst's question, assured that the Company would "***absolutely only produce to the demand that is there.***" Defendant Scherger stated, in pertinent part, the following:

> So the opportunity for the supply demand dynamic to play out in a relatively balanced way is actually quite high and quite favorable in that regard. ***And so we will absolutely only produce to the demand that is there. It's one of the reasons we're driving inventory out of the business so aggressively this year so that we can ramp up nicely as we're servicing our customers.***

169. Misstatement No. 12 was materially false and misleading when made because the Company was not producing "only" to demand; rather, the Company's institutional practice was to never shut down its mills regardless of demand, plants were manufacturing product far in excess of existing sales orders, Defendant Doss had personally overridden the Company's internal system that matched production to demand and then scrapped it entirely, and the Company's facilities were overwhelmed with historically high levels of unsold product. Misstatement No. 12 also failed to disclose that:

(a) Facilities across the Company's nationwide network were overwhelmed with historically high levels of unsold product, and as a result, plants were at full capacity, facilities were running out of warehouse space, the Company was forced to rent hundreds of thousands of

square feet of additional storage, and some facilities were warehousing trailers of excess product in parking lots;

(b) The Company's own Kinaxis demand planning system—which was implemented specifically to match customer demand with production—expressly warned that production of all beverage products should be curtailed because the Company had already manufactured what customers needed, yet Defendant Doss personally overrode those warnings and ordered continued production, and the Company subsequently scrapped the Kinaxis system, eliminating the system that was providing accurate demand forecasts that contradicted Defendants' preferred narrative;

(c) The Company had an institutional practice of never shutting down its mills regardless of demand, and the Company's supply teams ignored demand forecasts that did not support continued production;

(d) The Company had lost major customer accounts, including the Chick-fil-A cold cup project, the Nissin Foods instant noodle cup project, and the Burger King 27-ounce cup project, and the Company's sales team was unable to replace the lost business;

(e) The Company was experiencing a broad erosion of customer demand—losing national business faster than it could grow its regional business, watching smaller replacement customers leave the Company in 2025, and witnessing the failure of the Company's plastic replacement business;

(f) Monthly financial meetings, quarterly town halls hosted by Defendant Doss (at which he presented month-over-month aged inventory charts and told attendees that the Company had millions of dollars of boxes sitting in aged inventory), and tier-management reviews

(at which the C-Suite met with division leaders to review all data and metrics) all documented the mounting inventory crisis;

(g) The Company's 2025 production exceeded demand by approximately 30% according to the Company's own internal MAPE calculation; and

(h) As a result of the foregoing, Defendants' representations were materially misleading, as they concealed a severe and persistent inventory crisis driven by deliberate overproduction, artificially inflated demand conditions, the permanent loss of major customer accounts, and the structural deterioration of the Company's operations and financial condition.

### F. Graphic Packaging Q2 2025 Financial Results

170. On July 29, 2025, the Company filed its Q2 2025 Financial Results before the market opened.

#### 1. Misstatement No. 13—Q2 2025 Earnings Call

171. On July 29, 2025, during regular market hours, Defendants Doss and Scherger conducted the Q2 2025 Earnings Call with investors to discuss the Company's Q2 2025 Financial Results.

172. During the Q2 2025 Earnings Call, Defendant Doss assured investors that the Company's production curtailments were sufficient to resolve its inventory challenges. Defendant Doss stated, in pertinent part, that "***Our decision to curtail production to further reduce inventory levels . . . positions us to operate much closer to normal levels in the second half.***"

173. Misstatement No. 13 was materially false and misleading when made because Defendants' purported production curtailments did not "position" the Company to operate at "normal levels"—the Company's production practices remained fundamentally misaligned with actual demand, major customer accounts had been permanently lost, and the inventory and demand

crisis would persist throughout the remainder of the Class Period. Misstatement No. 13 also failed to disclose that:

(a) Facilities across the Company's nationwide network were overwhelmed with historically high levels of unsold product, and as a result, plants were at full capacity, facilities were running out of warehouse space, the Company was forced to rent hundreds of thousands of square feet of additional storage, and some facilities were warehousing trailers of excess product in parking lots;

(b) The Company's own Kinaxis demand planning system—which was implemented specifically to match customer demand with production—expressly warned that production of all beverage products should be curtailed because the Company had already manufactured what customers needed, yet Defendant Doss personally overrode those warnings and ordered continued production, and the Company subsequently scrapped the Kinaxis system, eliminating the system that was providing accurate demand forecasts that contradicted Defendants' preferred narrative;

(c) The Company had an institutional practice of never shutting down its mills regardless of demand, and the Company's supply teams ignored demand forecasts that did not support continued production;

(d) The Company had lost major customer accounts, including the Chick-fil-A cold cup project, the Nissin Foods instant noodle cup project, and the Burger King 27-ounce cup project, and the Company's sales team was unable to replace the lost business;

(e) The Company was experiencing a broad erosion of customer demand—losing national business faster than it could grow its regional business, watching smaller

replacement customers leave the Company in 2025, and witnessing the failure of the Company's plastic replacement business;

(f) Monthly financial meetings, quarterly town halls hosted by Defendant Doss (at which he presented month-over-month aged inventory charts and told attendees that the Company had millions of dollars of boxes sitting in aged inventory), and tier-management reviews (at which the C-Suite met with division leaders to review all data and metrics) all documented the mounting inventory crisis;

(g) The Company's 2025 production exceeded demand by approximately 30% according to the Company's own internal MAPE calculation; and

(h) As a result of the foregoing, Defendants' representations were materially misleading, as they concealed a severe and persistent inventory crisis driven by deliberate overproduction, artificially inflated demand conditions, the permanent loss of major customer accounts, and the structural deterioration of the Company's operations and financial condition.

**2. Misstatement No. 14—Q2 2025 Earnings Call**

174. Also during the same Q2 2025 Earnings Call, Defendant Scherger echoed Defendant Doss's assurances and stated, in pertinent part, that "[t]he second quarter is our biggest maintenance quarter and ***we took aggressive action to manage inventories, which . . . positions us to run at more normal levels in the second half[.]***"

175. Misstatement No. 14 was materially false and misleading when made because the Defendants had not taken "aggressive action" sufficient to resolve the Company's inventory crisis; in fact, facilities across the Company remained overflowing with unsold product and internal metrics continued to show deteriorating performance. Misstatement No. 14 also failed to disclose that:

(a) Facilities across the Company's nationwide network were overwhelmed with historically high levels of unsold product, and as a result, plants were at full capacity, facilities were running out of warehouse space, the Company was forced to rent hundreds of thousands of square feet of additional storage, and some facilities were warehousing trailers of excess product in parking lots;

(b) The Company's own Kinaxis demand planning system—which was implemented specifically to match customer demand with production—expressly warned that production of all beverage products should be curtailed because the Company had already manufactured what customers needed, yet Defendant Doss personally overrode those warnings and ordered continued production, and the Company subsequently scrapped the Kinaxis system, eliminating the system that was providing accurate demand forecasts that contradicted Defendants' preferred narrative;

(c) The Company had an institutional practice of never shutting down its mills regardless of demand, and the Company's supply teams ignored demand forecasts that did not support continued production;

(d) The Company had lost major customer accounts, including the Chick-fil-A cold cup project, the Nissin Foods instant noodle cup project, and the Burger King 27-ounce cup project, and the Company's sales team was unable to replace the lost business;

(e) The Company was experiencing a broad erosion of customer demand—losing national business faster than it could grow its regional business, watching smaller replacement customers leave the Company in 2025, and witnessing the failure of the Company's plastic replacement business;

(f) Monthly financial meetings, quarterly town halls hosted by Defendant Doss (at which he presented month-over-month aged inventory charts and told attendees that the Company had millions of dollars of boxes sitting in aged inventory), and tier-management reviews (at which the C-Suite met with division leaders to review all data and metrics) all documented the mounting inventory crisis;

(g) The Company's 2025 production exceeded demand by approximately 30% according to the Company's own internal MAPE calculation; and

(h) As a result of the foregoing, Defendants' representations were materially misleading, as they concealed a severe and persistent inventory crisis driven by deliberate overproduction, artificially inflated demand conditions, the permanent loss of major customer accounts, and the structural deterioration of the Company's operations and financial condition.

**3. Misstatement No. 15—Q2 2025 Earnings Call**

176. Also during the same Q2 2025 Earnings Call, Defendant Scherger, in response to an analyst's question, portrayed the Company's inventory situation as substantially resolved, stating that the Defendants were "***very pleased with our inventory reduction efforts***" and that "***the economic impact of that is relatively modest***." Defendant Scherger stated, in pertinent part, the following:

> Q2 was very high for planned maintenance and less market-related downtime as we took over 50,000 tons of inventory out of the company in the first half that doesn't need to be repeated in the second half. So two major components to the $100 million [] price and performance being $25 million and $60 million cumulatively. The remaining $15 million is a cross-section of some other inflation FX [foreign exchange] items, so relatively modest.
>
> [. . . ***W]e're very pleased with our inventory reduction efforts through -- from December here through June. There'll be more inventory coming out of the company naturally in the second half of the year with the Middletown closure. But the economic impact of that is relatively modest as we sell aggressively out of inventory.***

177. Misstatement No. 15 was materially false and misleading when made because Defendants had no reason to be "very pleased" with inventory reduction efforts or to characterize the economic impact as "relatively modest," since the Company's inventory levels remained severely high across the Company, customer demand had collapsed, and the Company had not been successful in replacing lost business, making the true scope of the inventory crisis and its financial impact far more severe than Defendants acknowledged to investors. Misstatement No. 15 also failed to disclose that:

(a) Facilities across the Company's nationwide network were overwhelmed with historically high levels of unsold product, and as a result, plants were at full capacity, facilities were running out of warehouse space, the Company was forced to rent hundreds of thousands of square feet of additional storage, and some facilities were warehousing trailers of excess product in parking lots;

(b) The Company's own Kinaxis demand planning system—which was implemented specifically to match customer demand with production—expressly warned that production of all beverage products should be curtailed because the Company had already manufactured what customers needed, yet Defendant Doss personally overrode those warnings and ordered continued production, and the Company subsequently scrapped the Kinaxis system, eliminating the system that was providing accurate demand forecasts that contradicted Defendants' preferred narrative;

(c) The Company had an institutional practice of never shutting down its mills regardless of demand, and the Company's supply teams ignored demand forecasts that did not support continued production;

(d) The Company had lost major customer accounts, including the Chick-fil-A cold cup project, the Nissin Foods instant noodle cup project, and the Burger King 27-ounce cup project, and the Company's sales team was unable to replace the lost business;

(e) The Company was experiencing a broad erosion of customer demand—losing national business faster than it could grow its regional business, watching smaller replacement customers leave the Company in 2025, and witnessing the failure of the Company's plastic replacement business;

(f) Monthly financial meetings, quarterly town halls hosted by Defendant Doss (at which he presented month-over-month aged inventory charts and told attendees that the Company had millions of dollars of boxes sitting in aged inventory), and tier-management reviews (at which the C-Suite met with division leaders to review all data and metrics) all documented the mounting inventory crisis;

(g) The Company's 2025 production exceeded demand by approximately 30% according to the Company's own internal MAPE calculation; and

(h) As a result of the foregoing, Defendants' representations were materially misleading, as they concealed a severe and persistent inventory crisis driven by deliberate overproduction, artificially inflated demand conditions, the permanent loss of major customer accounts, and the structural deterioration of the Company's operations and financial condition.

**4. Misstatement No. 16—Q2 2025 Earnings Call**

178. Also during the Q2 2025 Earnings Call, Defendant Doss, in response to an analyst's question, explained that "***[O]ur volume [is] obviously quite good . . . I can tell you we're busy, we're steady. The demand is strong. We've got no indications from them that it's kind of back off before the normal occurrence[.]***"

179. Misstatement No. 16 was materially false and misleading when made because demand was not "strong;" rather, the Company had lost major customer accounts, including Chick-fil-A, Nissin Foods, and Burger King, was losing business faster than it could be replaced, and the Company's own internal systems and meetings documented collapsing demand and escalating inventory. Misstatement No. 16 also failed to disclose that:

(a) Facilities across the Company's nationwide network were overwhelmed with historically high levels of unsold product, and as a result, plants were at full capacity, facilities were running out of warehouse space, the Company was forced to rent hundreds of thousands of square feet of additional storage, and some facilities were warehousing trailers of excess product in parking lots;

(b) The Company's own Kinaxis demand planning system—which was implemented specifically to match customer demand with production—expressly warned that production of all beverage products should be curtailed because the Company had already manufactured what customers needed, yet Defendant Doss personally overrode those warnings and ordered continued production, and the Company subsequently scrapped the Kinaxis system, eliminating the system that was providing accurate demand forecasts that contradicted Defendants' preferred narrative;

(c) The Company had an institutional practice of never shutting down its mills regardless of demand, and the Company's supply teams ignored demand forecasts that did not support continued production;

(d) The Company had lost major customer accounts, including the Chick-fil-A cold cup project, the Nissin Foods instant noodle cup project, and the Burger King 27-ounce cup project, and the Company's sales team was unable to replace the lost business;

(e) The Company was experiencing a broad erosion of customer demand—losing national business faster than it could grow its regional business, watching smaller replacement customers leave the Company in 2025, and witnessing the failure of the Company's plastic replacement business;

(f) Monthly financial meetings, quarterly town halls hosted by Defendant Doss (at which he presented month-over-month aged inventory charts and told attendees that the Company had millions of dollars of boxes sitting in aged inventory), and tier-management reviews (at which the C-Suite met with division leaders to review all data and metrics) all documented the mounting inventory crisis;

(g) The Company's 2025 production exceeded demand by approximately 30% according to the Company's own internal MAPE calculation; and

(h) As a result of the foregoing, Defendants' representations were materially misleading, as they concealed a severe and persistent inventory crisis driven by deliberate overproduction, artificially inflated demand conditions, the permanent loss of major customer accounts, and the structural deterioration of the Company's operations and financial condition.

**5. Misstatement No. 17—Q2 2025 Earnings Call**

180. Also during the Q2 2025 Earnings Call, Defendant Doss told investors, in response to an analyst's question, that the Company had learned from past mistakes, was now exercising restraint, and had "***burn[ed] . . . off***" its excess inventory, representing that "***[w]e're being very cautious***," "***we're not doing that***," *i.e.*, building inventory, and with respect to the excess inventory the Company had "***burn[t] it off in the first six month of this year***." Defendant Doss stated, in pertinent part, the following:

> Our innovation, as I mentioned earlier to a previous question, we're on track for our 2% this year. We're encouraged by that. But relative to try to completely call the second half of the year, it's very difficult for us to do that right now because we

> don't have a ton of insight. Customers, they're telling us that they're going to promote. They told us that last year. ***We're being very cautious, as you know, because we built inventory last year to accommodate that promotional activity and we had to burn it off in the first six months of this year. So, we're not doing that***.

181. Misstatement No. 17 was materially false and misleading when made because the Company had not "burn[t]" through its excess inventory glut and Defendants were not being "cautious;" rather, they were in fact continuing to do precisely what Defendant Doss claimed they were not, *i.e.*, overproducing inventory in the face of insufficient demand, with facilities at historic highs, and additional warehouse space being rented. Misstatement No. 17 also failed to disclose that:

(a) Facilities across the Company's nationwide network were overwhelmed with historically high levels of unsold product, and as a result, plants were at full capacity, facilities were running out of warehouse space, the Company was forced to rent hundreds of thousands of square feet of additional storage, and some facilities were warehousing trailers of excess product in parking lots;

(b) The Company's own Kinaxis demand planning system—which was implemented specifically to match customer demand with production—expressly warned that production of all beverage products should be curtailed because the Company had already manufactured what customers needed, yet Defendant Doss personally overrode those warnings and ordered continued production, and the Company subsequently scrapped the Kinaxis system, eliminating the system that was providing accurate demand forecasts that contradicted Defendants' preferred narrative;

(c) The Company had an institutional practice of never shutting down its mills regardless of demand, and the Company's supply teams ignored demand forecasts that did not support continued production;

(d) The Company had lost major customer accounts, including the Chick-fil-A cold cup project, the Nissin Foods instant noodle cup project, and the Burger King 27-ounce cup project, and the Company's sales team was unable to replace the lost business;

(e) The Company was experiencing a broad erosion of customer demand—losing national business faster than it could grow its regional business, watching smaller replacement customers leave the Company in 2025, and witnessing the failure of the Company's plastic replacement business;

(f) Monthly financial meetings, quarterly town halls hosted by Defendant Doss (at which he presented month-over-month aged inventory charts and told attendees that the Company had millions of dollars of boxes sitting in aged inventory), and tier-management reviews (at which the C-Suite met with division leaders to review all data and metrics) all documented the mounting inventory crisis;

(g) The Company's 2025 production exceeded demand by approximately 30% according to the Company's own internal MAPE calculation; and

(h) As a result of the foregoing, Defendants' representations were materially misleading, as they concealed a severe and persistent inventory crisis driven by deliberate overproduction, artificially inflated demand conditions, the permanent loss of major customer accounts, and the structural deterioration of the Company's operations and financial condition.

**6. Misstatement No. 18—Q2 2025 Earnings Call**

182. Also during the Q2 2025 Earnings Call and in response to an analyst's question, Defendant Doss reassured investors that the Company's production was tightly calibrated to demand, representing that the Company was "***very focused on managing our supply and demand, making sure we have the paperboard to take care of customers, but no more than we need, very disciplined in that regard.***" Defendant Doss stated, in pertinent part, the following:

> Pricing has been pretty stable. And that certainly in contrast to bleached paperboard. ***We've taken some actions to address the inventories, as you've heard Steve talk about, took out 50,000 tons here in our second quarter. We're going to continue to be very focused on managing our supply and demand, making sure we have the paperboard to take care of customers, but no more than we need, very disciplined in that regard.*** And I've already mentioned the 370,000 tons that have come out of the CRB in the unbleached paperboard side.

183. Misstatement No. 18 was materially false and misleading when made because Defendants were neither "disciplined" nor producing "no more than we need;" rather, the Company's plants were manufacturing product far in excess of existing sale orders, Defendants ignored actual demand—including by ignoring and then scrapping the Company's demand forecasting system—and the Company operated under an institutional policy of never shutting down its mills. Misstatement No. 18 also failed to disclose that:

(a) Facilities across the Company's nationwide network were overwhelmed with historically high levels of unsold product, and as a result, plants were at full capacity, facilities were running out of warehouse space, the Company was forced to rent hundreds of thousands of square feet of additional storage, and some facilities were warehousing trailers of excess product in parking lots;

(b) The Company's own Kinaxis demand planning system—which was implemented specifically to match customer demand with production—expressly warned that production of all beverage products should be curtailed because the Company had already manufactured what customers needed, yet Defendant Doss personally overrode those warnings and ordered continued production, and the Company subsequently scrapped the Kinaxis system, eliminating the system that was providing accurate demand forecasts that contradicted Defendants' preferred narrative;

(c) The Company had an institutional practice of never shutting down its mills regardless of demand, and the Company's supply teams ignored demand forecasts that did not support continued production;

(d) The Company had lost major customer accounts, including the Chick-fil-A cold cup project, the Nissin Foods instant noodle cup project, and the Burger King 27-ounce cup project, and the Company's sales team was unable to replace the lost business;

(e) The Company was experiencing a broad erosion of customer demand—losing national business faster than it could grow its regional business, watching smaller replacement customers leave the Company in 2025, and witnessing the failure of the Company's plastic replacement business;

(f) Monthly financial meetings, quarterly town halls hosted by Defendant Doss (at which he presented month-over-month aged inventory charts and told attendees that the Company had millions of dollars of boxes sitting in aged inventory), and tier-management reviews (at which the C-Suite met with division leaders to review all data and metrics) all documented the mounting inventory crisis;

(g) The Company's 2025 production exceeded demand by approximately 30% according to the Company's own internal MAPE calculation; and

(h) As a result of the foregoing, Defendants' representations were materially misleading, as they concealed a severe and persistent inventory crisis driven by deliberate overproduction, artificially inflated demand conditions, the permanent loss of major customer accounts, and the structural deterioration of the Company's operations and financial condition.

**7. Misstatement No. 19—Q2 2025 Earnings Call**

184. Also during the Q2 2025 Earnings Call, Defendant Scherger, in response to an analyst's question, reinforced this message to investors, representing that the Company was

"***producing at or below our overall needs and kind of keeping the business just very dialed in***."

Defendant Scherger stated, in pertinent part, the following:

> The modest increase in revenue on a flat volume assumption is primarily FX-driven as you mentioned, and then, also given overall – nothing really due on inflation, in terms of incremental inflation, it actually was down a bit in the quarter versus what we saw in Q1. It really goes to what we've chatted about earlier around ***just being very assertive on managing supply and demand, producing at or below our overall needs and kind of keeping the business just very dialed in relative to this overall relatively uncertain demand environment and running to that. And so, that's what's got us maintaining the midpoint of our guide given that the top line up modestly, that's a bit FX-driven as well, like we were chatting earlier about the impact on the balance sheet.***

185. Misstatement No. 19 was materially false and misleading when made because the Company was not "producing at or below . . . overall needs" and was not "very dialed in;" rather, plants across the Company's operations were overwhelmed with unsold product, the Company had scrapped its demand forecasting system, and the Company's 2025 production exceeded demand by approximately 30% according to the Company's own MAPE calculation. Misstatement No. 19 also failed to disclose that:

(a) Facilities across the Company's nationwide network were overwhelmed with historically high levels of unsold product, and as a result, plants were at full capacity, facilities were running out of warehouse space, the Company was forced to rent hundreds of thousands of square feet of additional storage, and some facilities were warehousing trailers of excess product in parking lots;

(b) The Company's own Kinaxis demand planning system—which was implemented specifically to match customer demand with production—expressly warned that production of all beverage products should be curtailed because the Company had already manufactured what customers needed, yet Defendant Doss personally overrode those warnings and ordered continued production, and the Company subsequently scrapped the Kinaxis system,

eliminating the system that was providing accurate demand forecasts that contradicted Defendants' preferred narrative;

(c) The Company had an institutional practice of never shutting down its mills regardless of demand, and the Company's supply teams ignored demand forecasts that did not support continued production;

(d) The Company had lost major customer accounts, including the Chick-fil-A cold cup project, the Nissin Foods instant noodle cup project, and the Burger King 27-ounce cup project, and the Company's sales team was unable to replace the lost business;

(e) The Company was experiencing a broad erosion of customer demand—losing national business faster than it could grow its regional business, watching smaller replacement customers leave the Company in 2025, and witnessing the failure of the Company's plastic replacement business;

(f) Monthly financial meetings, quarterly town halls hosted by Defendant Doss (at which he presented month-over-month aged inventory charts and told attendees that the Company had millions of dollars of boxes sitting in aged inventory), and tier-management reviews (at which the C-Suite met with division leaders to review all data and metrics) all documented the mounting inventory crisis;

(g) The Company's 2025 production exceeded demand by approximately 30% according to the Company's own internal MAPE calculation; and

(h) As a result of the foregoing, Defendants' representations were materially misleading, as they concealed a severe and persistent inventory crisis driven by deliberate overproduction, artificially inflated demand conditions, the permanent loss of major customer accounts, and the structural deterioration of the Company's operations and financial condition.

### G. September 3, 2025 Jefferies Industrials Conference

186. Defendants again, while attending the September 3, 2025 Jefferies Industrials Conference (the "Jefferies Conference"), disseminated misrepresentations and omissions regarding the Company's financial strength, further misleading investors concerning the state and affairs of Graphic Packaging. Specifically, Defendants offered the following false and misleading statements.

#### 1. Misstatement No. 20—Jefferies Conference

187. During the Jefferies Conference, Defendant Doss assured investors that the period of reduced customer demand was far behind the Company, representing that destocking was "***in our rearview mirror***" and that the Company was "***matching our supply and demand like we always do.***" Defendant Doss stated, in pertinent part, the following:

> ***I get asked a lot, is there still destocking going on? If there is, we don't really feel it as a material impact on our business. I think most of that's in our rearview mirror, but you can certainly see where it was in 2023.*** Our volumes held up pretty well. We did take a fair amount of market-related downtime in our paperboard manufacturing facilities to make sure that we dealt with that, ***matching our supply and demand like we always do.*** But you can see the margins held up pretty good during that period of time.

188. Misstatement No. 20 was materially false and misleading when made because the demand collapse was not "in the rearview mirror," the Company was not "matching supply and demand," and matching was not something the Defendants "always" did; indeed, monthly internal meetings and reports documented the persistent inventory crisis and highlighted that the Company's 2025 production exceeded demand by approximately 30% according to the Company's own MAPE calculation. Misstatement No. 20 also failed to disclose that:

(a) Facilities across the Company's nationwide network were overwhelmed with historically high levels of unsold product, and as a result, plants were at full capacity, facilities were running out of warehouse space, the Company was forced to rent hundreds of thousands of

square feet of additional storage, and some facilities were warehousing trailers of excess product in parking lots;

(b) The Company's own Kinaxis demand planning system—which was implemented specifically to match customer demand with production—expressly warned that production of all beverage products should be curtailed because the Company had already manufactured what customers needed, yet Defendant Doss personally overrode those warnings and ordered continued production, and the Company subsequently scrapped the Kinaxis system, eliminating the system that was providing accurate demand forecasts that contradicted Defendants' preferred narrative;

(c) The Company had an institutional practice of never shutting down its mills regardless of demand, and the Company's supply teams ignored demand forecasts that did not support continued production;

(d) The Company had lost major customer accounts, including the Chick-fil-A cold cup project, the Nissin Foods instant noodle cup project, and the Burger King 27-ounce cup project, and the Company's sales team was unable to replace the lost business;

(e) The Company was experiencing a broad erosion of customer demand—losing national business faster than it could grow its regional business, watching smaller replacement customers leave the Company in 2025, and witnessing the failure of the Company's plastic replacement business;

(f) Monthly financial meetings, quarterly town halls hosted by Defendant Doss (at which he presented month-over-month aged inventory charts and told attendees that the Company had millions of dollars of boxes sitting in aged inventory), and tier-management reviews

(at which the C-Suite met with division leaders to review all data and metrics) all documented the mounting inventory crisis;

(g) The Company's 2025 production exceeded demand by approximately 30% according to the Company's own internal MAPE calculation; and

(h) As a result of the foregoing, Defendants' representations were materially misleading, as they concealed a severe and persistent inventory crisis driven by deliberate overproduction, artificially inflated demand conditions, the permanent loss of major customer accounts, and the structural deterioration of the Company's operations and financial condition.

## H. Graphic Packaging Q3 2025 Financial Results

189. In the Company's Q3 2025 Financial Results, filed on November 4, 2025 before the market opened and signed by Defendant Scherger, Defendants again affirmatively misrepresented the Company's strength in the market and reiterated untrue statements of material facts and/or omitted to state other facts necessary to make the statements therein not misleading. Specifically, they included the following false and misleading statements.

### 1. Misstatement No. 21—Q3 2025 Financial Results

190. The Q3 2025 Financial Results portrayed the quarter as one of successful execution and "***reduced inventory***." The Financial Results stated, in pertinent part, the following:

> ***[W]e executed well in the quarter, reduced inventory, and saw our innovation engine open new markets for paperboard packaging.***

191. Misstatement No. 21 was materially false and misleading when made because characterizing the quarter as one in which the Company "executed well" and "reduced inventory" concealed the true severity of the Company's ongoing inventory crisis—inventory levels remained severely elevated, the Company was continuing to overproduce, the Company's 2025 production exceeded demand by approximately 30% according to the Company's own MAPE calculation,

and the inventory problem was so severe that the Company would be forced to accelerate reduction plans and disclose a $130 million negative impact to EBITDA within months. Misstatement No. 21 also failed to disclose that:

(a) Facilities across the Company's nationwide network were overwhelmed with historically high levels of unsold product, and as a result, plants were at full capacity, facilities were running out of warehouse space, the Company was forced to rent hundreds of thousands of square feet of additional storage, and some facilities were warehousing trailers of excess product in parking lots;

(b) The Company's own Kinaxis demand planning system—which was implemented specifically to match customer demand with production—expressly warned that production of all beverage products should be curtailed because the Company had already manufactured what customers needed, yet Defendant Doss personally overrode those warnings and ordered continued production, and the Company subsequently scrapped the Kinaxis system, eliminating the system that was providing accurate demand forecasts that contradicted Defendants' preferred narrative;

(c) The Company had an institutional practice of never shutting down its mills regardless of demand, and the Company's supply teams ignored demand forecasts that did not support continued production;

(d) The Company had lost major customer accounts, including the Chick-fil-A cold cup project, the Nissin Foods instant noodle cup project, and the Burger King 27-ounce cup project, and the Company's sales team was unable to replace the lost business;

(e) The Company was experiencing a broad erosion of customer demand—losing national business faster than it could grow its regional business, watching smaller

replacement customers leave the Company in 2025, and witnessing the failure of the Company's plastic replacement business;

(f) Monthly financial meetings, quarterly town halls hosted by Defendant Doss (at which he presented month-over-month aged inventory charts and told attendees that the Company had millions of dollars of boxes sitting in aged inventory), and tier-management reviews (at which the C-Suite met with division leaders to review all data and metrics) all documented the mounting inventory crisis;

(g) The Company's 2025 production exceeded demand by approximately 30% according to the Company's own internal MAPE calculation; and

(h) As a result of the foregoing, Defendants' representations were materially misleading, as they concealed a severe and persistent inventory crisis driven by deliberate overproduction, artificially inflated demand conditions, the permanent loss of major customer accounts, and the structural deterioration of the Company's operations and financial condition.

**2. Misstatement No. 22—Q3 2025 Earnings Call**

192. On November 4, 2025, during regular market hours, Defendant Doss conducted the Q3 2025 Earnings Call with investors to discuss the Company's Q3 2025 Financial Results.

193. During the Q3 2025 Earnings Call, Defendant Doss touted that "***[w]e executed well in the quarter, made progress on costs and reduced inventory.***"

194. Misstatement No. 22 was materially false and misleading when made because the Company had not meaningfully "made progress" on its inventory crisis; rather, inventory levels remained at historic highs, the Company was continuing to overproduce and refusing to shut down mills, and plant-level financial metrics presented at monthly meetings showed continuing EBITDA deterioration driven by declining customer demand. Misstatement No. 22 also failed to disclose that:

(a) Facilities across the Company's nationwide network were overwhelmed with historically high levels of unsold product, and as a result, plants were at full capacity, facilities were running out of warehouse space, the Company was forced to rent hundreds of thousands of square feet of additional storage, and some facilities were warehousing trailers of excess product in parking lots;

(b) The Company's own Kinaxis demand planning system—which was implemented specifically to match customer demand with production—expressly warned that production of all beverage products should be curtailed because the Company had already manufactured what customers needed, yet Defendant Doss personally overrode those warnings and ordered continued production, and the Company subsequently scrapped the Kinaxis system, eliminating the system that was providing accurate demand forecasts that contradicted Defendants' preferred narrative;

(c) The Company had an institutional practice of never shutting down its mills regardless of demand, and the Company's supply teams ignored demand forecasts that did not support continued production;

(d) The Company had lost major customer accounts, including the Chick-fil-A cold cup project, the Nissin Foods instant noodle cup project, and the Burger King 27-ounce cup project, and the Company's sales team was unable to replace the lost business;

(e) The Company was experiencing a broad erosion of customer demand—losing national business faster than it could grow its regional business, watching smaller replacement customers leave the Company in 2025, and witnessing the failure of the Company's plastic replacement business;

(f) Monthly financial meetings, quarterly town halls hosted by Defendant Doss (at which he presented month-over-month aged inventory charts and told attendees that the Company had millions of dollars of boxes sitting in aged inventory), and tier-management reviews (at which the C-Suite met with division leaders to review all data and metrics) all documented the mounting inventory crisis;

(g) The Company's 2025 production exceeded demand by approximately 30% according to the Company's own internal MAPE calculation; and

(h) As a result of the foregoing, Defendants' representations were materially misleading, as they concealed a severe and persistent inventory crisis driven by deliberate overproduction, artificially inflated demand conditions, the permanent loss of major customer accounts, and the structural deterioration of the Company's operations and financial condition.

**3. Misstatement No. 23—Q3 2025 Earnings Call**

195. During the same Q3 2025 Earnings Call, Defendant Doss framed the Company's challenges as the product of competitive dynamics rather than internal failures, representing that the Company was taking action to "***protect our margin profile***" and "***align [its] order books with customers who understand the durable competitive advantages that [the Company] ha[s]***." Defendant Doss stated, in pertinent part, the following:

> In this environment, ***we are focused on the things we can control, and that includes cost and inventory. We are assessing opportunities to further reduce SG&A and finding other opportunities to reduce costs, which I believe will further cement our significant efficiency and margin advantage over competitors.***
>
> ***You saw us take action to reduce inventory in [Q2] and [Q3], and we will continue to drive inventory out of our system . . . In [Q4], we will take further action to balance production with customer demand, which we expect to have approximately a $15 million impact on EBITDA.***
>
> ***These decisions are intended to protect our margin profile and to protect our volume.*** At a time when competitors are running for cash and signing contracts that we believe carry margins well below the cost of capital, we are focused on

> protecting our industry-leading margins and protecting share where we are the best and most logical supplier in the medium and long term.
>
> ***We are using this period of unusual competitive behavior to align our order books with customers who understand the durable competitive advantages that we have in innovation, cost, efficiency and quality.***
>
> Our year-end leverage target is up modestly.

196. Misstatement No. 23 was materially false and misleading when made because Defendants were not protecting margins through genuine operational strength or strategic customer alignment; rather, the Company had lost major customers because significant projects had been cancelled, resulting in the Company artificially sustaining its margins through continued overproduction, and the resulting $15 million Q4 EBITDA impact Defendants disclosed was a fraction of the true cost that would later be revealed as a $130 million negative impact to 2026 EBITDA. Misstatement No. 23 also failed to disclose that:

(a) Facilities across the Company's nationwide network were overwhelmed with historically high levels of unsold product, and as a result, plants were at full capacity, facilities were running out of warehouse space, the Company was forced to rent hundreds of thousands of square feet of additional storage, and some facilities were warehousing trailers of excess product in parking lots;

(b) The Company's own Kinaxis demand planning system—which was implemented specifically to match customer demand with production—expressly warned that production of all beverage products should be curtailed because the Company had already manufactured what customers needed, yet Defendant Doss personally overrode those warnings and ordered continued production, and the Company subsequently scrapped the Kinaxis system, eliminating the system that was providing accurate demand forecasts that contradicted Defendants' preferred narrative;

(c) The Company had an institutional practice of never shutting down its mills regardless of demand, and the Company's supply teams ignored demand forecasts that did not support continued production;

(d) The Company had lost major customer accounts, including the Chick-fil-A cold cup project, the Nissin Foods instant noodle cup project, and the Burger King 27-ounce cup project, and the Company's sales team was unable to replace the lost business;

(e) The Company was experiencing a broad erosion of customer demand—losing national business faster than it could grow its regional business, watching smaller replacement customers leave the Company in 2025, and witnessing the failure of the Company's plastic replacement business;

(f) Monthly financial meetings, quarterly town halls hosted by Defendant Doss (at which he presented month-over-month aged inventory charts and told attendees that the Company had millions of dollars of boxes sitting in aged inventory), and tier-management reviews (at which the C-Suite met with division leaders to review all data and metrics) all documented the mounting inventory crisis;

(g) The Company's 2025 production exceeded demand by approximately 30% according to the Company's own internal MAPE calculation; and

(h) As a result of the foregoing, Defendants' representations were materially misleading, as they concealed a severe and persistent inventory crisis driven by deliberate overproduction, artificially inflated demand conditions, the permanent loss of major customer accounts, and the structural deterioration of the Company's operations and financial condition.

**4. Misstatement No. 24—Q3 2025 Earnings Call**

197. Also during the Q3 2025 Earnings Call, Defendant Doss, in response to an analyst's question, told investors that Defendants possessed "***a unique perspective to be able to look at our***

***overall system, look at our supply chains, take a step back and really make sure that we're challenging kind of where we're at and what we can do[, which] are the levers that we really have in our control***" and they can "***manage . . . supply and demand***" and "***do it cost effectively***."
Defendant Doss stated, in pertinent part, the following:

> [W]e've got a number of levers that we can pull to really make sure that we operate the business as efficiently and effectively as possible. And those kind of in order, our first thing is CapEx is going to revert back to a more normalized level to 5% or below. That's going to generate in excess of $350 million of free cash flow just by that.
>
> And ultimately, even though, as you well know, we've got a very low-cost structure here, we're looking at every cost, SG&A and plant costs, that really allow us to make sure that we don't impact customer service levels. But given some of the realities we've got going on in the market, we've got to challenge all those things. And we're doing that stuff internally here. So we'll continue to do that. And ultimately, taking a look at our inventory situation, you've seen we've had a capital release so far this year of about $30 million. We expect upwards of another $20 million here in Q4. And as we go into next year, that'll be another area we're really looking at hard. Because with Waco and Kalamazoo online, if you think about it, we now have five very well-capitalized paperboard manufacturing facilities.
>
> ***And that gives us a unique perspective to be able to look at our overall system, look at our supply chains, take a step back, and really make sure that we're challenging kind of where we're at and what we can do***. So ***those are the levers that we really have in our control***. That's how I'm thinking about it. As I mentioned to Ghansham, ***if we need to take action to manage our supply and demand*** on our coated recycled paperboard, as Waco really ramps up quick, we can toggle our K1 machine. We're able to do that, and ***we're able to do it cost-effectively***.

198. Misstatement No. 24 was materially false and misleading when made because Defendants did not have a functioning system to "manage supply and demand;" in fact, they had scrapped the Company's demand forecasting system after Defendant Doss personally overrode its recommendation to curtail production, and the Company was operating under a companywide policy of overproduction that contradicted any claim of effective supply-demand management. Misstatement No. 24 also failed to disclose that:

(a) Facilities across the Company's nationwide network were overwhelmed with historically high levels of unsold product, and as a result, plants were at full capacity, facilities were running out of warehouse space, the Company was forced to rent hundreds of thousands of square feet of additional storage, and some facilities were warehousing trailers of excess product in parking lots;

(b) The Company's own Kinaxis demand planning system—which was implemented specifically to match customer demand with production—expressly warned that production of all beverage products should be curtailed because the Company had already manufactured what customers needed, yet Defendant Doss personally overrode those warnings and ordered continued production, and the Company subsequently scrapped the Kinaxis system, eliminating the system that was providing accurate demand forecasts that contradicted Defendants' preferred narrative;

(c) The Company had an institutional practice of never shutting down its mills regardless of demand, and the Company's supply teams ignored demand forecasts that did not support continued production;

(d) The Company had lost major customer accounts, including the Chick-fil-A cold cup project, the Nissin Foods instant noodle cup project, and the Burger King 27-ounce cup project, and the Company's sales team was unable to replace the lost business;

(e) The Company was experiencing a broad erosion of customer demand—losing national business faster than it could grow its regional business, watching smaller replacement customers leave the Company in 2025, and witnessing the failure of the Company's plastic replacement business;

(f) Monthly financial meetings, quarterly town halls hosted by Defendant Doss (at which he presented month-over-month aged inventory charts and told attendees that the Company had millions of dollars of boxes sitting in aged inventory), and tier-management reviews (at which the C-Suite met with division leaders to review all data and metrics) all documented the mounting inventory crisis;

(g) The Company's 2025 production exceeded demand by approximately 30% according to the Company's own internal MAPE calculation; and

(h) As a result of the foregoing, Defendants' representations were materially misleading, as they concealed a severe and persistent inventory crisis driven by deliberate overproduction, artificially inflated demand conditions, the permanent loss of major customer accounts, and the structural deterioration of the Company's operations and financial condition.

**5. Misstatement No. 25—Q3 2025 Earnings Call**

199. Also during the Q3 2025 Earnings Call, Defendant Doss made a sweeping historical claim that "***Graphic Packaging has a long and consistent practice of matching our board production to our demand for our packaging.***"

200. Misstatement No. 25 was materially false and misleading when made because the Company did not have a "long and consistent practice of matching board product to demand," and in fact, its actual practice was the opposite: overproducing product even when demand was not there, never shutting down its mills regardless of demand, and overriding the system capable of accurately matching production to demand. Misstatement No. 25 also failed to disclose that:

(a) Facilities across the Company's nationwide network were overwhelmed with historically high levels of unsold product, and as a result, plants were at full capacity, facilities were running out of warehouse space, the Company was forced to rent hundreds of thousands of

square feet of additional storage, and some facilities were warehousing trailers of excess product in parking lots;

(b) The Company's own Kinaxis demand planning system—which was implemented specifically to match customer demand with production—expressly warned that production of all beverage products should be curtailed because the Company had already manufactured what customers needed, yet Defendant Doss personally overrode those warnings and ordered continued production, and the Company subsequently scrapped the Kinaxis system, eliminating the system that was providing accurate demand forecasts that contradicted Defendants' preferred narrative;

(c) The Company had an institutional practice of never shutting down its mills regardless of demand, and the Company's supply teams ignored demand forecasts that did not support continued production;

(d) The Company had lost major customer accounts, including the Chick-fil-A cold cup project, the Nissin Foods instant noodle cup project, and the Burger King 27-ounce cup project, and the Company's sales team was unable to replace the lost business;

(e) The Company was experiencing a broad erosion of customer demand—losing national business faster than it could grow its regional business, watching smaller replacement customers leave the Company in 2025, and witnessing the failure of the Company's plastic replacement business;

(f) Monthly financial meetings, quarterly town halls hosted by Defendant Doss (at which he presented month-over-month aged inventory charts and told attendees that the Company had millions of dollars of boxes sitting in aged inventory), and tier-management reviews

(at which the C-Suite met with division leaders to review all data and metrics) all documented the mounting inventory crisis;

(g) The Company's 2025 production exceeded demand by approximately 30% according to the Company's own internal MAPE calculation; and

(h) As a result of the foregoing, Defendants' representations were materially misleading, as they concealed a severe and persistent inventory crisis driven by deliberate overproduction, artificially inflated demand conditions, the permanent loss of major customer accounts, and the structural deterioration of the Company's operations and financial condition.

## VIII. ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

### A. The Defendants Knew of, or Recklessly Disregarded, Overwhelming Internal Information of a Severe Inventory Crisis Driven by Overproduction, Collapsing Customer Demand, and Ignored Warnings, Yet Ordered Production to Continue

201. Throughout the Class Period, the Defendants possessed knowledge of or recklessly disregarded Graphic Packaging's lack of customer demand and mounting aged inventory glut through their review and dissemination of internal demand forecasts and individual plant data.

#### 1. Kinaxis Told Defendants They Were Over-Producing

202. Prior to the start of the Class Period, the Company implemented the Kinaxis sales and operating planning system specifically to provide accurate demand forecasting and to "avoid manufacturing more product than customers purchased."

203. According to CW-8, a few months prior to his departure in March 2025, Kinaxis RapidResponse told Graphic Packaging to stop manufacturing cartons for Beverage clients based on customer demand forecasts and plant manufacturing details because the Company already manufactured what was forecasted.

204. This was not a subtle signal—it was an express alert from the Company's own demand forecasting system that production should cease for a product category representing approximately 30% of the Company's annual revenue.

205. Instead of heeding this warning, Defendant Doss personally intervened to override it.

206. CW-8 recalled that he attended a meeting with Doss and former Vice President, Supply Chain Planning and Customer Care Paul Myler shortly after Kinaxis RapidResponse told Graphic Packaging to stop manufacturing cartons for Beverage clients. CW-8 detailed that Doss ignored Kinaxis RapidResponse and told attendees at this meeting to continue running plants and manufacturing cartons for Beverage clients even though Kinaxis RapidResponse told the Company that it caught up with demand for Beverage clients. CW-8 added that Graphic Packaging scrapped the Kinaxis project shortly after this meeting.

207. This response—ignoring and then eliminating the system that was providing demand forecasts contrary to the Defendants' preferred narrative—demonstrates that Defendants did not merely fail to appreciate the significance of the Kinaxis warning; they actively sought to suppress information that contradicted his preferred narrative of effective inventory management and strong demand.

208. Likewise, according to CW-11, sometime in 2024 the S&OP system informed the Company that it did not need as much beverage supply as it was forcing into the environment based on information it was fed, but Graphic Packaging ultimately ignored this S&OP system and did not shut down its mills.

209. The Company's internal metrics ultimately confirmed that its "demand forecasts" were in fact severely and systematically inaccurate.

210. CW-11 stated that during his tenure, Graphic Packaging calculated its (“MAPE”) to determine how accurate its forecasts were in relation to actual values. According to CW-11, Graphic Packaging’s MAPE in 2025 was roughly 30%, which indicated that the Company did not sell the products it forecasted to sell and therefore had the “wrong inventory.” CW-11 referred to this as being “out of mix.”

211. This extraordinary deviation indicates that the Company overproduced in 2025 by nearly one-third.

**2. Inventory Levels Were at Historic Highs Across Multiple Facilities**

212. Confidential witnesses from across the Company’s operations uniformly described inventory conditions that were extreme and unprecedented.

213. According to CW-3, inventory levels in 2025 were the “highest I’ve ever seen.” According to CW-10, inventory at the Solon plant was “extraordinarily high” in the first half of 2025. CW-10 stated that the Solon plant was “bursting at the seams” in 2025 because it was filled with product. CW-1 explained that Graphic Packaging had locations across the United States and each had their own warehouse that were all experiencing excess inventory issues. CW-4 detailed that the Shelbyville and Visalia plants were at full capacity and had no space for inventory in 2025. CW-4 recalled that the Pittston facility was looking for additional warehouse space because there was no more room in the facility for inventory.

214. These conditions were not isolated or localized—they existed across multiple facilities spanning different regions and product lines. The pervasive nature of the inventory crisis meant that it could not have escaped the Individual Defendants’ attention. Indeed, decreasing inventory was at the forefront of every quarterly meeting and town hall in 2025, which were hosted by Defendant Doss. During those meetings, Defendant Doss told attendees that the Company had millions of dollars of boxes sitting in aged inventory.

215. According to CW-5, Doss also presented month-over-month aged inventory charts in the quarterly meetings and town halls in 2025.

216. This direct, personal involvement demonstrates that Defendant Doss was fully aware of the severity of the inventory crisis, even as he publicly assured investors that the Company was effectively managing inventory and matching supply to demand.

**3. Loss of Major Customer Accounts**

217. Just before and at the start of the Class Period, the Company lost several major customer accounts. CW-4 referred to the Chick-fil-A project as the "biggest Foodservice project in many years." However, CW-4 noted that this Chick-fil-A project never came to fruition because Chick-fil-A cancelled this project in Q3 2024. CW-4 detailed that former CEO Mike Doss and Chick-fil-A CEO Andrew Cathy visited the Company's Shelbyville facility together in June 2024, which indicated how big of a project this was for both companies. CW-4 further explained that after the Chick-fil-A project was cancelled in Q3 2024, he provided data for a presentation to members of the C-Suite that detailed the capital impact the cancellation would have on the Foodservice division. Similarly, CW-4 recalled that Graphic Packaging's Foodservice division also expected to obtain significant growth in 2025 from a project with Nissin Foods. However, CW-4 noted that Nissin Foods cancelled this project entirely in February 2025 or March 2025 because it found a cheaper source. And CW-4 recalled that a third project with Burger King was also cancelled. CW-4 stated that Burger King cancelled this project in the second half of 2024.

218. CW-4 further explained that after the Chick-fil-A project was cancelled in Q3 2024, he provided data for a presentation to members of the C-Suite that detailed the capital impact the cancellation would have on the Foodservice division.

219. CW-4 referred to increasing inventory as a "big problem" and a "death cycle" because the Company had so much cash (*i.e.* product) sitting in inventory.

220. These customer losses directly contradicted the Individual Defendants' public statements about the strength of demand and the Company's competitive position and worsened the Company's inventory glut. The cancellation of the Chick-fil-A project—which Defendant Doss had personally been involved in promoting—Nissin Foods project, and Burger King project would have been known to the Individual Defendants. Yet the Individual Defendants continued to assure investors that demand was "strong," that customer destocking was "largely over," and that the Company was "well-positioned."

**4. The Company's Institutional Practice of Never Shutting Down Mills**

221. During the Class Period, the Company had a deliberate policy of continuing production regardless of demand. For example, CW-11 explained that it was Graphic Packaging's "institutional behavior" to never shut down its mills, even when the Company no longer needed to manufacture additional supply. He detailed that supply teams referenced customer demand forecasts but ignored demand forecasts if those forecasts did not fit the supply team's agenda. CW-11 added that the supply team told him and other members of the demand forecasting team to "find" demand when there was not enough. CW-10 recalled that when the Solon plant told Graphic Packaging that it was taking on more raw materials than it needed, the Company responded, "Too bad." CW-10 suggested that by manufacturing raw materials that were not needed, the Company was "inflating output." Additionally, CW-4 stated that the Shelbyville facility continued making more inventory in 2025 after the Chick-fil-A project was cancelled.

222. This institutional practice—which existed at the direction of the Individual Defendants—directly contradicted the Individual Defendants' repeated public statements that the Company was "matching supply and demand," "running to demand," and taking "aggressive action to manage inventories." The existence of an institutional policy to continue production

regardless of demand demonstrates that the Individual Defendants' statements were not merely optimistic assessments that proved incorrect; they were affirmatively false when made.

### 5. Monthly and Quarterly Reports Showed Deteriorating Performance

223. The Company's internal reporting systems continuously flagged the deteriorating business conditions that the Individual Defendants concealed from investors.

224. According to CW-9, during monthly financial meetings in 2024 and Q1 2025, the Head of Finance and Vice President of Manufacturing told attendees that certain carton plants were losing business, and the EBITDA numbers and financial figures presented at these monthly financial meetings reflected that different carton plants were "suffering in EBITDA." CW-9 confirmed that the number one reason given in monthly financial meetings in Q1 2025 as to why these carton plants were not hitting their EBITDA numbers was because customer orders and sales declined. CW-9 noted that information presented at monthly financial meetings was consolidated and given to the Company's C-Suite.

225. CW-5 recalled that Graphic Packaging maintained plant metrics, including inventory, forecasting and volume, in a software platform called QlikView. According to CW-5, the Company aggregated data from QlikView and this data made its way up to Doss.

226. Moreover, according to CW-5, decreasing inventory was at the forefront of every quarterly meeting and town hall in 2025, which were hosted by Doss. During those meetings, Doss told attendees that the Company had millions of dollars of boxes sitting in aged inventory and instructed them to make progress on reducing aged inventory. According to CW-5, Doss also presented month-over-month aged inventory charts in the quarterly meetings and town halls in 2025.

227. CW-1 also recalled having quarterly town hall meetings conducted over Teams that were led by the company's CEO. CW-1 recalled that during one of the town hall meetings, it was

mentioned that the company needed to free up cash flow and they laid off thousands of employees to help.

228. Similarly, CW-4 recalled as part of the Company's tier management monthly reviews, Graphic Packaging's C-Suite met with division leaders in the second or third week of every month in 2025. CW-4 detailed that during these monthly meetings, the Company's C-Suite reviewed numbers and results with division leaders. CW-4 explained that all Foodservice data and metrics were reviewed at these monthly reviews. According to CW-4, the increasing inventory and idle equipment were discussed "all the time" at monthly Foodservice business review meetings in 2025. CW-4 noted that metrics, key performance indicators (KPIs), inventory levels, quality, overall equipment efficiency (OEE) and safety were all also reviewed at monthly Foodservice business review meetings.

229. This steady stream of internal reports documenting declining orders and excessive inventory levels constituted a continuous flow of information that the Individual Defendants either knew about or recklessly ignored.

230. In fact, the Individual Defendants admitted that they possessed the foregoing oversight into Graphic Packaging's operations to know about and ignore, or recklessly fail to review, this adverse information. Particularly, during Graphic Packaging's Q3 2025 conference call, Defendant Doss conceded that Defendants have "a unique perspective to be able to look at our overall system, look at our supply chains, take a step back and really make sure that we're challenging kind of where we're at and what we can do." Likewise, at the beginning of the Class Period during the Q4 and FY2024 Earnings Call, Defendant Doss told investors that they had their "eye on" inventory levels.

231. Taken together, these adverse facts—the express warning, the historically high inventory levels across multiple facilities, the loss of major customer accounts, the institutional practice of overproduction, the stream of internal reports documenting deteriorating performance, and the ultimate 30% MAPE—paint a picture of a company whose senior executives were either acutely aware of the falsity of their public statements or so reckless in their disregard of overwhelming contrary and obvious evidence that their conduct rises to and above the level of scienter required under the PSLRA. No reasonable executive in the Individual Defendants' positions, possessing the information they possessed, could have believed that the Company was effectively "matching supply and demand" or that inventory levels were being "managed" and would "normalize." The Individual Defendants' continued false statements in the face of these facts supports a strong inference of scienter.

## B. Motive and Opportunity to Commit Fraud

### 1. Overproduction to "Smooth" Earnings and Meet Financial Guidance Provided Motive to Commit Fraud

232. The Company's guidance trajectory provides further evidence of scienter and motive. At the start of the Class Period, Defendants issued full-year 2025 adjusted EBITDA guidance of $1.66 billion to $1.76 billion, adjusted EPS guidance of $2.48 to $2.73, and net sales guidance of $8.6 billion to $8.8 billion. This guidance could only be achieved if the Company continued to defer fixed manufacturing overhead into inventory through sustained overproduction. Each quarter, the Defendants faced a concrete choice: curtail production to align with actual demand (which would force immediate recognition of deferred costs and guarantee a guidance miss) or continue overproducing (which would defer those costs and preserve some prospect of meeting their public targets). The Defendants chose to continue overproducing.

233. As the Class Period progressed and Defendants were compelled to begin curtailing production, the previously deferred costs began to surface and guidance was cut repeatedly—from a $1.66 billion to $1.76 billion adjusted EBITDA range in February 2025, to $1.4 billion to $1.6 billion in May 2025, to $1.45 billion to $1.55 billion in July 2025, and finally to a $1.40 billion to $1.45 billion range in November 2025. The Company's actual full-year 2025 adjusted EBITDA of $1,395 million missed even the floor of this final, already-reduced range. The total decline—$265 million from the midpoint of initial guidance to actual results—represents the cumulative financial impact of Defendants' absorption costing and overproduction.

234. The following chart summarizes the evolution of Defendants' FY 2025 financial guidance over the Class Period:

| **Metric** | **Initial (Feb. 2025)** | **Q1 Update (May 2025)** | **Q2 Update (Jul. 2025)** | **Final (Q3 Update, Nov. 2025)** |
|---|---|---|---|---|
| **Net Sales** | $8.6B–$8.8B | $8.2B–$8.5B | $8.4B–$8.6B | **$8.4B–$8.6B** |
| **Adj. EBITDA** | $1.66B–$1.76B | $1.4B–$1.6B | $1.45B–$1.55B | **$1.40B–$1.45B** |
| **Adj. EPS** | $2.48–$2.73 | $1.75–$2.25 | $1.90–$2.20 | **$1.80–$2.00** |

235. The following chart compares Defendants' FY 2025 financial guidance vs. actual results:

| **Metric** | **Initial Guidance (Feb. 2025)** | **Final Guidance (Nov. 2025)** | **FY2025 Actual** | **Met / Missed / Exceeded** | **Degree of Variance** |
|---|---|---|---|---|---|
| **Net Sales** | \$8.6B–\$8.8B | \$8.4B–\$8.6B | **\$8,617M** | **Met** (vs. final); **Met** (vs. initial — at bottom) | At high end of final range; at bottom of initial range |
| **Adj. EBITDA** | \$1.66B–\$1.76B | \$1.40B–\$1.45B | **\$1,395M** | **Missed** final range narrowly; **Missed** initial range significantly | \$5M below final floor (\$1.40B); \$265M below initial midpoint (\$1.71B) |
| **Adj. EPS** | \$2.48–\$2.73 | \$1.80–\$2.00 | **\$1.80** | **Met** (vs. final — at floor); **Missed** initial range significantly | At exact floor of final range; \$0.68 below initial midpoint (\$2.61) |

236. Notably, adjusted EPS landed at exactly \$1.80—the precise floor of the Company's final guidance range of \$1.80 to \$2.00, and \$0.68 below the midpoint of initial guidance of \$2.48 to \$2.73. Landing at the exact floor of repeatedly reduced guidance, rather than missing it, is consistent with Defendants managing reported earnings through the calibration of production levels. It suggests that the Defendants adjusted the pace of production curtailment to just barely meet their most recently lowered expectations—moderating the timing of cost recognition to avoid a complete guidance miss while they could no longer sustain the full scope of the overproduction scheme.

237. Most tellingly, the Company's net sales for fiscal year 2025 came in at \$8,617 million—at the high end of its final guidance range and within the initial guidance range. This demonstrates that customer demand was not the primary driver of the Company's financial deterioration, contrary to Defendants' repeated representations. Revenue held steady while profitability collapsed, a divergence that is explained only by the recognition of previously

deferred manufacturing costs once the overproduction of product could no longer be sustained. The Defendants, who had direct visibility into the Company's internal financial data, production levels, and inventory metrics, knew or recklessly disregarded that the Company's reported financial performance was being artificially sustained by continued overproduction and that any reduction in production would trigger the recognition of deferred costs sufficient to cause material guidance misses.

### 2. Executive Compensation Tied to Performance Metrics Provided Additional Motive to Commit Fraud

238. The Individual Defendants had additional motive to perpetuate the fraud because their compensation was directly tied to Graphic Packaging's reported financial performance. As disclosed in the Company's proxy statements, a substantial portion of the Individual Defendants' compensation consisted of performance-based bonuses and equity awards tied to metrics including EBITDA and cash flow generation. By inflating reported earnings through over-production and absorption costing—which deferred expense recognition by continuing to produce inventory even when demand did not support such production—the Individual Defendants stood to receive higher incentive compensation than they would have received had the Company's true financial condition been accurately reported.

239. The significance of compensation as a motive is underscored by the Company's own February 3, 2026 disclosure, which revealed that 2026 EBITDA guidance included "an approximately $100 million accrual (non-cash in 2026) for a return to more normal incentive compensation." This disclosure indicates that during the Class Period, incentive compensation had been depressed—presumably because, once the truth was revealed and the Company was forced to recognize the inventory-related expenses it had been deferring, the metrics on which executive

compensation was based deteriorated significantly. The Individual Defendants thus had a powerful incentive to delay this reckoning for as long as possible.

### 3. The Individual Defendants Had Unfettered Opportunity to Commit Fraud

240. The Individual Defendants had complete access to Graphic Packaging's material non-public information and exercised direct control over the Company's financial reporting and public disclosures, providing them with ample opportunity to commit the fraud alleged herein. Defendant Doss, as President and CEO, was the Company's most senior executive officer, responsible for overseeing all aspects of the Company's operations, including production decisions, inventory management, and strategic direction. Defendant Scherger, as EVP and CFO, was directly responsible for the Company's financial reporting, internal controls, and the accuracy of the Company's SEC filings.

241. As detailed above, the Individual Defendants had direct access to internal systems that tracked inventory levels, demand forecasts, and plant performance metrics. For example, CW-5 recalled that Graphic Packaging maintained plant metrics, including inventory, forecasting and volume, in a software platform called QlikView. According to CW-5, the Company aggregated data from QlikView and this data made its way up to Doss. Furthermore, CW-5 stated that Doss presented month-over-month aged inventory charts in quarterly meetings and town halls in 2025.

242. CW-8 recalled that he attended a meeting with Doss and former Vice President, Supply Chain Planning and Customer Care Paul Myler shortly after Kinaxis RapidResponse told Graphic Packaging to stop manufacturing cartons for Beverage clients. CW-8 detailed that Doss ignored Kinaxis RapidResponse and told attendees at this meeting to continue running plants and manufacturing cartons for Beverage clients even though Kinaxis RapidResponse told the Company that it caught up with demand for Beverage clients.

243. Defendant Doss also conceded that the Defendants had "a unique perspective to be able to look at our overall system, look at our supply chains, take a step back and really make sure that we're challenging kind of where we're at and what we can do."

244. This direct, personal involvement in reviewing and overriding internal data demonstrates that the Individual Defendants had intimate knowledge of the Company's true inventory condition and demand challenges.

245. The Individual Defendants also exercised direct control over the content of the Company's public statements. Both Defendants Doss and Scherger personally made the misstatements alleged herein during earnings calls, investor conferences, and in press releases. Both signed the Company's SEC filings, including the SEC Form 10-Qs and SEC Form 10-K containing materially false and misleading statements. And both executed Sarbanes-Oxley certifications attesting to the accuracy of the Company's disclosures and the effectiveness of its internal controls. This control over the Company's communications with the investing public provided the Individual Defendants with the means to perpetuate the fraud by continuing to make false statements even as internal data contradicted their public representations.

**C. Executive Departures Strengthen the Inference of Scienter**

246. Executive departures at significant times and circumstances contribute to the inference of scienter. Here, the conclusion that the Graphic Packaging executives were culpable for engaging in fraudulent inventory practices is strengthened by their timely departures from the Company, whether in the form of termination or resignation, while financial adjustments and fraudulent conduct began to be revealed.

247. On May 1, 2025, a Graphic Packaging press release announced that Maggie Bidlingmaier, Executive Vice President and President, Americas, resigned from her position at Graphic Packaging Holding Company. That same day, the Company announced its revised

financials, which revealed that the Company was experiencing significantly worse demand and volume conditions.

248. On October 9, 2025, Defendant Stephen R. Scherger, former Executive Vice President and CFO, resigned from his role at Graphic Packaging to pursue other opportunities. This announcement came less than one month before the Company announced its Q3 2025 financial results.

249. On December 8, 2025, a Graphic Packaging press release announcing that Defendant Michael P. Doss would be departing from his role as CEO was released the same day as the disclosure of the company's revised financials, including adjusted EBITDA for FY 2025. The same press release outlined the Company's plan to accelerate inventory reduction plans, negatively impacting Q4 2025 financial results. All the December 8 press releases were during post-market hours, and financial analysts, including those from Raymond James and Jefferies, described Defendant Doss's departure as "unexpected."

250. Prior to parting ways with the Company, Defendant Doss was aware of and participated in calls discussing fraudulent inventory practices at Graphic Packaging. For example, CW-8 recalled that he attended a meeting with Doss and former Vice President, Supply Chain Planning and Customer Care Paul Myler shortly after Kinaxis RapidResponse told Graphic Packaging to stop manufacturing cartons for Beverage clients. CW-8 detailed that Doss ignored Kinaxis RapidResponse and told attendees at this meeting to continue running plants and manufacturing cartons for Beverage clients even though Kinaxis RapidResponse told the Company that it caught up with demand for Beverage clients.

251. There is a strong indication of a connection between the inventory issues, the adjusted financials, and the departure of Defendant Doss, given his awareness of the inventory and

the quick succession of events. Accordingly, the timing and circumstances surrounding Defendant Doss's departure strengthens the inference of his scienter.

252. Following Graphic Packaging's decision to part ways with Defendant Doss, Robbert Rietbroeck was introduced as the new CEO. His tenure at the Company was effective as of January 1, 2026.

253. Only a few weeks after the departure of Defendant Doss, Lauren Tashma, former Graphic Packaging Executive Vice President, General Counsel, and Secretary, resigned from her role at the Company. Tashma's resignation was announced on the same day as Robbert Rietbroeck's introduction message to Graphic Packaging employees as the new CEO.

254. The timing and circumstances of each of these departures—essentially the Company's entire C-Suite—strengthens the inference of the Defendants' scienter.

**D. Analysts' Frequent Interest In and Questions About Graphic Packaging's Inventory and Customer Demand and Defendants' Proclaimed Knowledge**

255. Analysts frequently asked the Individual Defendants about Graphic Packaging's inventory levels and customer demand. In fact, twelve of the misstatements alleged above were in response to an analyst's question. *See* Misstatement Nos. 4–5, 8–10, 12, 15–19, 24. Given the frequency and import of these questions, the Individual Defendants were prepared to—and did—answer these questions during earnings calls. As part of their preparation, Defendants were obligated to investigate the Company's inventory levels and customer demand and knew—or were reckless in not knowing—the undisclosed truth and that their statements to investors were false and misleading.

256. In preparing for repeated and expected questions from analysts about Graphic Packaging's inventory levels and customer demand, the Individual Defendants discovered—or would have been reckless in not discovering:

(a) Facilities across the Company's nationwide network were overwhelmed with historically high levels of unsold product, and as a result, plants were at full capacity, facilities were running out of warehouse space, the Company was forced to rent hundreds of thousands of square feet of additional storage, and some facilities were warehousing trailers of excess product in parking lots;

(b) The Company's own Kinaxis demand planning system—which was implemented specifically to match customer demand with production—expressly warned that production of all beverage products should be curtailed because the Company had already manufactured what customers needed, yet Defendant Doss personally overrode those warnings and ordered continued production, and the Company subsequently scrapped the Kinaxis system, eliminating the system that was providing accurate demand forecasts that contradicted Defendants' preferred narrative;

(c) The Company had an institutional practice of never shutting down its mills regardless of demand, and the Company's supply teams ignored demand forecasts that did not support continued production;

(d) The Company had lost major customer accounts, including the Chick-fil-A cold cup project, the Nissin Foods instant noodle cup project, and the Burger King 27-ounce cup project, and the Company's sales team was unable to replace the lost business;

(e) The Company was experiencing a broad erosion of customer demand—losing national business faster than it could grow its regional business, watching smaller replacement customers leave the Company in 2025, and witnessing the failure of the Company's plastic replacement business;

(f) Monthly financial meetings, quarterly town halls hosted by Defendant Doss (at which he presented month-over-month aged inventory charts and told attendees that the Company had millions of dollars of boxes sitting in aged inventory), and tier-management reviews (at which the C-Suite met with division leaders to review all data and metrics) all documented the mounting inventory crisis; and

(g) The Company's 2025 production exceeded demand by approximately 30% according to the Company's own internal MAPE calculation.

257. Indeed, in response to these questions and during earnings calls, Defendant Doss told investors that Defendants had their "eye on" inventory levels (Q4 and FY 2024 Earnings Call), that they were "very focused on managing our supply and demand" (Q2 2025 Earnings Call), and that they had a "unique perspective to be able to look at our overall system" and "take action to manage our supply and demand" (Q3 2025 Earnings Call). These statements all demonstrate that the Defendants were personally keeping an "eye on" the Company's inventory, supply, and demand, and are accordingly highly indicative of Defendants' scienter as well.

### E. It Would Be Absurd to Conclude That the Individual Defendants Were Unaware of the Company's Inventory Levels Connected to the Company's Most Important Business Segment

258. In connection with the foregoing allegations of scienter, the following allegations further support an inference of scienter when viewed holistically.

259. The Company's most important business segment during the Class Period, responsible for ***68%*** of the Company's reportable net sales, was its Americas Paperboard Packaging segment, *i.e.*, its business segment responsible for production and sale of product and inventory within the Americas. Additionally, the Company explained in its 2025 Form 10-K that, with respect to such business division, net sales derived from "countries outside of the United States" were not material to its reporting.

260. Thus, the most important sources of Graphic Packaging's product, inventory, and sales were derived from the Company's facilities within the United States.

261. As discussed *supra* at V.D, multiple former employees explained the same widespread conditions within the Company's United States facilities, including manufacturing plants in California, Oregon, Minnesota, Wisconsin, Illinois, Indiana, and Ohio. Multiple former employees described—and corroborated each other's statements—that the Company was experiencing a widespread inventory crisis during the Class Period. Indeed, CW-4 referred to increasing inventory as a "big problem" and a "death cycle" because the Company had so much cash (*i.e.* product) sitting in inventory.

262. Additionally, the Company explained that its CODM was Defendant Doss. As CODM, Defendant Doss was tasked with—and directly responsible for—"allocating resources," "assessing performance of the operating segments of the Company," and "making strategic decisions." Importantly, the Company also disclosed that as CODM, the evaluation of such responsibilities was based "primarily on Income from Operations," which includes Net Sales and Cost of Sales as line items, and that the CODM "***evaluates the segments' operating results on a regular basis***," including for the Americas Paperboard Packaging segment.[8]

263. Given such "regular" evaluation of the Company's operations within the United States (which accounted for the majority and material amount of the Company's net sales during the Class Period), it would be absurd to suggest that the Individual Defendants—including Defendant Doss—were unaware of the inventory crisis occurring during the Class Period that was directly affecting the Company's Net Sales and Cost of Sales. This is especially true for Defendant

[8] *See* Company's 2025 Form 10-K at 71.

Doss as the Company disclosed that it was his responsibility during the Class Period to review the aforementioned Company information as CODM.

## IX. LOSS CAUSATION

264. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Lead Plaintiff and members of the Class. Throughout the Class Period, Defendants' materially false and misleading statements and omissions artificially inflated the market price of Graphic Packaging common stock. During the Class Period, Lead Plaintiff and other Class members purchased Graphic Packaging common stock at artificially inflated prices and were damaged when the truth was revealed through a series of partial corrective disclosures that caused the price of Graphic Packaging common stock to decline as the artificial inflation was removed from the stock price.

### A. First Partial Corrective Disclosure: May 1, 2025

265. On May 1, 2025, during pre-market hours, Graphic Packaging issued a press release reporting its Q1 2025 financial results. The press release revealed that the Company was experiencing significantly worse demand and volume conditions than Defendants had previously disclosed. Specifically, the press release reported Q1 non-GAAP EPS of $0.51, missing consensus estimates by $0.07, and revenue of $2.12 billion, representing a 6% year-over-year decline and missing consensus estimates by $10 million. More significantly, the press release revealed that the Company had negatively revised its previously issued FY 2025 guidance: net sales outlook was reduced to a range of $8.2 billion to $8.5 billion, significantly down from prior guidance of $8.7 billion to $8.9 billion; adjusted EBITDA outlook was reduced to a range of $1.4 billion to $1.6 billion, significantly down from prior guidance of $1.68 billion to $1.78 billion; and adjusted EPS outlook was reduced to a range of $1.75 to $2.25, significantly down from prior guidance of $2.53 to $2.78. The Company blamed the negative revised guidance on "an expectation of 2% volume

decline and $80 million of input cost inflation at the midpoint," as well as "higher macroeconomic and consumer spending uncertainty."

266. On the same day, the Defendants conducted an earnings call with investors during which they added additional information to the partial corrective disclosure.

267. In particular, Defendant Doss acknowledged "near-term challenges" and financial results, including margins, that were "significantly below our expectations." Defendant Doss stated, in pertinent part, the following:

> In the first quarter, our business faced considerable pressure, as already stretched consumers pulled back further. Promotional activity by our customers did not drive meaningful volume improvement, and we experienced significant input cost inflation. While these challenges won't be resolved overnight, neither are they long-term in nature. We have taken actions to offset higher costs and continue to generate innovation sales growth that is helping us grow faster than the end markets that we serve.
>
> Despite near-term challenges, we remain well positioned to generate substantial cash flow in the quarters and years ahead.
>
> In the first quarter, Graphic Packaging sales were $2.1 billion, adjusted EBITDA was $365 million, and margins were 17.2% and adjusted EPS was $0.51. Those results were significantly below our expectations, driven mainly by weaker volumes in the Americas business and broad-based input cost inflation.

268. Nevertheless, Defendant Doss assured investors that the Company "remain[ed] well positioned to generate substantial cash flow[.]

269. In response to analyst questions, Defendant Doss also disclosed that the Company was going to "eliminate some of the inventory," and assured investors that the Defendants were going to "run [the] business to requirement and demand" when asked about "supply demand balance."

270. The May 1, 2025 disclosures partially corrected Defendants' prior misstatements by revealing, for the first time, some of the demand and volume challenges facing Graphic

Packaging. Prior to this disclosure, Defendants had repeatedly assured investors that the Company was experiencing “strong and steady” results, that “customer destocking is largely over,” and that the Company’s business model was well-positioned to deliver on its financial guidance. The May 1, 2025 disclosures revealed were the first indication that the Defendants’ prior statements, including those about margin stability, customer destocking, and the buildup of “a little bit of paperboard inventory” purportedly in connection with the Waco start-up, were materially false and misleading.

271. The market reacted swiftly and severely to this partial corrective disclosure. As reported by RTT News that morning, the Company’s stock had “touched a new 52-week low of $21.16, with volume surging to 8.39 million shares, well above the average of 2.73 million.” The abnormal trading volume—more than three times the average daily volume—demonstrates that investors were reacting specifically to the new information disclosed on May 1, 2025, rather than general market conditions.

272. As a direct result of this partial corrective disclosure, Graphic Packaging’s stock price fell $3.94 per share, or 15.57%, to close at $21.37 per share on May 1, 2025. This precipitous decline was a direct and proximate result of the partial revelation of the truth regarding Defendants’ prior misstatements and omissions and caused damages to Lead Plaintiff and members of the Class who purchased Graphic Packaging common stock at artificially inflated prices prior to this disclosure.

273. Despite this partial corrective disclosure, Defendants continued to downplay the severity of the Company’s widespread inventory glut. During the Q1 2025 Earnings Call on May 1, 2025, Defendant Doss claimed that by “run[ning] our business really to demand,” that would “eliminate some of the inventory.” Defendant Doss presented this as having “short term” negative

implications while positioning the Company "for a rebound." Defendant Scherger affirmed these statements, claiming "[i]t's our expectation that we will flip to positive late this year" and asserting that "[i]nventory will be going down as the year plays itself out" and "[w]e will be taking inventory out of the business." As a result of these statements, the Defendants continued to mislead investors as to the true scope and severity of the Company's inventory glut.

**B. Second Partial Corrective Disclosure: December 8-9, 2025**

274. On December 8, 2025, during post-market hours, Graphic Packaging issued a press release announcing that it was accelerating certain inventory reduction plans into Q4 2025 that were originally planned for 2026. The press release disclosed that production curtailment was expected to negatively impact Q4 2025 operating results by $15 million, in addition to the $15 million in curtailments already announced during the Q3 2025 Earnings Call. The same press release also disclosed that Graphic Packaging had, once again, negatively revised its FY 2025 financial guidance, with adjusted EBITDA now expected to be in the range of $1.338 billion to $1.43 billion (down from $1.40 billion to $1.45 billion) and adjusted EPS expected to be in the range of $1.75 to $1.95 (down from $1.80 to $2.00).

275. Significantly, the same day, Graphic Packaging issued a separate press release announcing the departure of Defendant Doss as President and CEO, effective December 31, 2025. The Company announced that Defendant Doss had "mutually agreed with the Graphic Packaging Board of Directors to step down from his role and as a director." The abrupt and unexpected departure of the Company's CEO—announced concurrently with disclosures revealing some of the Company's inventory problems—further signaled to the market that prior management representations, in particular those made by Defendant Doss regarding inventory management and operational capabilities, had been materially misleading. However, the true extent of the prior representations' falsity was not fully revealed until the end of the Class Period.

276. The December 8, 2025 disclosures further corrected Defendants' prior misstatements by revealing that the Company's inventory problems were far more severe and persistent than Defendants had previously acknowledged, although the true extent of Defendants' fraud would not be fully revealed until the end of the Class Period. Throughout the Class Period, Defendants had repeatedly assured investors that they were "aggressively matching supply and demand," that inventory levels were being "reduced," and that the Company was "well-positioned" to generate strong cash flows. The December 8, 2025 disclosures revealed that these statements were materially false and misleading: inventory problems had become so severe that the Company was forced to accelerate inventory reduction plans originally scheduled for 2026, incurring significant additional costs and further reducing guidance.

277. Shortly after markets opened on December 9, 2025, Graphic Packaging's stock price had already fallen by more than 8%—the most in seven months—with trading volume spiking to more than seventeen times the 20-day average for that time of day. The extraordinary trading volume demonstrates that investors were reacting specifically to the December 8, 2025 disclosures, rather than general market conditions. Multiple market analysts, including Jefferies and Raymond James, commented on Defendant Doss's "unexpected" departure, further indicating that the market viewed these disclosures as material new information that contradicted prior management representations.

278. As a direct result of these partial corrective disclosures, Graphic Packaging's stock price fell $1.35 per share, or 8.66%, to close at $14.23 per share on December 9, 2025. This significant decline was a direct and proximate result of the further revelation of the truth regarding Defendants' prior misstatements and omissions concerning inventory management and operational capabilities and caused additional damages to Lead Plaintiff and members of the Class who

continued to hold Graphic Packaging common stock at artificially inflated prices prior to this disclosure.

**C. Third and Final Corrective Disclosure: February 3, 2026**

279. On February 3, 2026, during pre-market hours, Graphic Packaging issued a press release reporting its Q4 and FY 2025 financial results. The press release revealed the full extent of the Company's inventory problems and their impact on the Company's financial condition. The Company reported Q4 non-GAAP EPS of $0.29, missing consensus estimates by $0.06. Q4 EBITDA decreased 19% to $305 million, versus $376 million in the same quarter of the prior year. The Company attributed its disappointing results to "the impact of lower packaging price and volume, commodity and non-commodity costs, and negative Net Performance as a result of decisions taken to curtail production to reduce inventory."

280. Most significantly, the February 3, 2026 press release disclosed that the Company projected a substantial decline in adjusted EBITDA for 2026, with expected adjusted EBITDA of only $1.05 billion to $1.25 billion. The Company attributed this decline to "a $130 million negative impact from actions taken to reduce inventory and generate free cash flow." This disclosure revealed that the Company's inventory problems were not merely a short-term challenge, as Defendants had repeatedly represented, but rather a structural issue that would continue to materially impair the Company's financial performance well into 2026. The $130 million negative impact from inventory reduction represented the clearest admission to date that the Company had accumulated excessive inventory that would take years to work through—directly contradicting Defendants' repeated assurances throughout the Class Period that inventory levels were being managed and would normalize.

281. The February 3, 2026 disclosures completed the revelation of the fraud by confirming that Defendants' prior representations regarding the Company's inventory

management capabilities, demand conditions, and financial outlook had been materially false and misleading. Throughout the Class Period, Defendants had assured investors that the Company was effectively "matching supply and demand," that inventory issues would "normalize," and that the Company's business model would generate strong cash flows. The February 3, 2026 disclosures revealed that these representations were false: the Company had systematically overproduced inventory to inflate reported earnings, and the resulting inventory glut would cost the Company at least $130 million in 2026 alone—a fact that Defendants knew but concealed from investors.

282. CEO Rietbroek admitted that Graphic Packaging had significant inventory issues during the February 3, 2026 Q4 and FY 2025 Earnings Call. During that call, Rietbroek acknowledged that "we need to significantly reduce inventory and ensure that every spending decision brings an appropriate return." Rietbroek also admitted on that call that the Company would have to "remove approximately $260 million of paperboard and finished goods inventory in 2026." These statements revealed that, contrary to the Defendants' false assurances that "inventory will be going down" and that they were "taking inventory out of the business," inventory remained a significant, unaddressed issue throughout 2025.

283. The market's reaction to the February 3, 2026 disclosures demonstrated that investors viewed the Company's revelations as material new information that contradicted prior management representations. Multiple market analysts reacted with surprise and frustration. Jefferies wrote that "the quarter & outlook is disappointing and reflects a more competitive backdrop and structural headwinds than appreciated," and that Graphic Packaging "will likely be in the penalty box for some time," citing "negative net performance due to production curtailment to reduce inventory." Raymond James wrote that "4Q25 result is completely overshadowed by a disappointing 2026 guide and longer-term FCF outlook," noting the "$130M impact from actions

to reduce inventory." RBC Capital Markets noted that the Company's "FY26 Guide [was] Significantly Below-Street" expectations and issued a "Negative" sentiment. UBS Global Research characterized the Company's "2026 EBITDA [guidance as] significantly below consensus ($1.15B vs $1.4B)," citing factors related to "inventory reduction." Wells Fargo wrote that "[w]hile we previously looked past near-term challenges toward 2026 FCF strength, the abrupt CEO change with no industry experience, a vacant CFO seat, and softening fundamentals shift our view," noting that "[r]epeated EBITDA guidance cuts and mounting competitive pressure in boxboard further weigh on confidence in [Company] targets."

284. As a direct result of these final corrective disclosures, Graphic Packaging's stock price fell $2.36 per share, or 15.97%, to close at $12.42 per share on February 3, 2026. This precipitous decline was a direct and proximate result of the complete revelation of the truth regarding Defendants' prior misstatements and omissions and caused additional damages to Lead Plaintiff and members of the Class who continued to hold Graphic Packaging common stock at artificially inflated prices prior to this disclosure.

**D. Absence of Confounding Factors**

285. The stock price declines following each corrective disclosure were not caused by intervening market-wide or industry-specific events that would sever the causal connection between the corrective disclosures and Lead Plaintiff's and the Class's losses. On each of the corrective disclosure dates, there were no material market-wide events, macroeconomic announcements, or industry developments that would independently explain the significant stock price declines experienced by Graphic Packaging.

286. The abnormal trading volume on each corrective disclosure date further confirms that the stock price declines were caused by the specific information disclosed by Graphic Packaging, rather than general market conditions. On May 1, 2025, trading volume surged to 13.79

million shares, well above the average of 2.73 million. On December 9, 2025, trading volume spiked to 17.43 million shares, dramatically over the average. Such dramatic increases in trading volume are inconsistent with a general market decline and instead demonstrate that investors were specifically reacting to the new information disclosed by Graphic Packaging on those dates.

### E. Cumulative Damages

287. In total, across the three partial corrective disclosures, Graphic Packaging's stock price declined by approximately $7.65 per share, representing a cumulative decline of approximately 51% from the Class Period high. Lead Plaintiff and members of the Class suffered economic losses as a direct and proximate result of Defendants' materially false and misleading statements and omissions, and are entitled to recover damages for those losses.

## X. CONTROL PERSON ALLEGATIONS

288. The Individual Defendants, by virtue of their high-level and controlling positions at Graphic Packaging, directly participated in the management of the Company and were directly involved in the day-to-day operations of the Company at the highest levels. The Individual Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements therein and of their materially false and misleading nature.

289. Defendants Doss and Scherger, through their control and authority as senior officers and/or directors of Graphic Packaging, had access to the adverse undisclosed information about the Company's business through internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at regularly held meetings, as well as other management and Board of Directors meetings, and reports and other information provided to them in connection therewith.

290. Furthermore, as senior officers and/or directors of Graphic Packaging—a publicly-held company whose common stock was, and is, during the relevant time, registered with the SEC pursuant to the Exchange Act and traded on the NYSE—Defendants Doss and Scherger had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, internal controls, growth, financial statements, and financial condition, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Graphic Packaging common stock would be based on accurate information. Each of the Individual Defendants violated these requirements and obligations during the Class Period.

291. Defendants Doss and Scherger, because of their positions of control and authority, were able to and did control the content of Graphic Packaging's SEC filings, press releases, and other public statements issued by or on behalf of Graphic Packaging during the Class Period. Each would have been provided with copies of the documents and statements made in the SEC filings at issue in this action before they were issued to the public and would have had the ability to prevent their issuance or cause them to be corrected.

292. Accordingly, the Individual Defendants were responsible for the accuracy of the public statements alleged herein.

293. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on all persons and entities who purchased or otherwise acquired Graphic Packaging common stock during the Class Period, which included, but was not limited to, the dissemination of materially false and misleading information and concealing and omitting material adverse facts concerning Graphic Packaging's overwhelming inventory glut, significant loss of customers and demand, and deteriorating financial conditions. The scheme deceived the investing public regarding Graphic Packaging's business, operations,

and management, and the intrinsic value of Graphic Packaging common stock, and caused Lead Plaintiff and members of the Class to purchase Graphic Packaging common stock at artificially inflated prices.

294. In making the statements complained of herein, the Individual Defendants, who were senior officers and/or directors of Graphic Packaging, were acting on behalf of the Company in the regular course of business. Therefore, each statement made by the Individual Defendants during the Class Period is attributable to the Company.

## XI. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

295. The statutory safe harbor, provided for forward-looking statements under certain circumstances, does not apply to any of the allegedly false statements pleaded herein. The statements alleged to be false and misleading all relate to then-existing facts and conditions. To the extent certain statements alleged to be false or misleading are determined to be mixed statements of historical or present information and future information, such statements are not entitled to the safe harbor with respect to the part of the statement that refers to historical or present information.

296. Furthermore, to the extent certain of the statements alleged to be false or misleading may be characterized as forward looking, they were not identified as "forward-looking statements" when made and no meaningful cautionary language identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. To the extent Defendants included cautionary language, that language was not meaningful because any potential risks identified by Defendants had already passed or manifested. As detailed herein, Defendants failed to disclose to the market that, throughout the Class Period, Graphic Packaging suffered from an overwhelming inventory glut, a significant loss of customers and demand, and a

deteriorating financial condition that prevented the Company from attaining its financial projections.

297. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Graphic Packaging who knew that the statement was false when made.

## XII. PRESUMPTION OF RELIANCE

298. To the extent Lead Plaintiff alleges affirmative misstatements, Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts required to render other statements non-misleading during the Class Period;

(b) The misrepresentations and omissions were material;

(c) Graphic Packaging common stock traded in an efficient market;

(d) The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Graphic Packaging common stock;

(e) Lead Plaintiff and members of the Class purchased Graphic Packaging stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts;

(f) Graphic Packaging common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

(g) According to the Company's SEC Form 10-K filed on March 2, 2026, the Company had approximately 295,740,911 shares then outstanding, demonstrating a very active and broad market for Graphic Packaging common stock;

(h) Graphic Packaging filed periodic public reports with the SEC;

(i) Graphic Packaging regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services, the internet and other wide-ranging public disclosures;

(j) Graphic Packaging was followed by securities analysts employed by major brokerage firms—including Seaport Research Partners, RBC Capital Markets, Jefferies Research, Wells Fargo Securities, Raymond James, UBS Securities LLC, BofA Global Research, and Citigroup Inc.—that wrote reports distributed to the sales force and customers of their respective brokerage firms, were publicly available, and entered the public marketplace;

(k) Unexpected material news about Graphic Packaging was rapidly reflected in and incorporated into the Company's stock price during the Class Period; and

(l) There were market makers for Graphic Packaging's shares during the Class Period.

299. As a result of the foregoing, the market for Graphic Packaging common stock promptly digested current information about the Company from publicly available sources and reflected such information in the Company's share price. Under these circumstances, all persons and entities who purchased or otherwise acquired Graphic Packaging common stock during the Class Period, *i.e.*, the Class members, suffered similar injuries through their purchases of Graphic

Packaging common stock at artificially inflated prices, rendering the presumption of reliance applicable.

300. A class-wide presumption of reliance is also appropriate in this action under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972) to the extent the claims asserted herein against Defendants are predicated on omissions of material fact for which there was a duty to disclose.

## XIII. CLASS ACTION ALLEGATIONS

301. Subject to the exclusions below, Lead Plaintiff bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class of all persons and entities who or which purchased or otherwise acquired Graphic Packaging common stock during the period of February 4, 2025 through February 2, 2026, both dates inclusive, and were damaged thereby (the "Class").

302. Excluded from the Class are: (i) Defendants; (ii) the Individual Defendants' immediate family members; (iii) any officer, director, or control person of Graphic Packaging during the Class Period, and their immediate families; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling or beneficial interest; (v) Graphic Packaging's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person, in their capacities as such.

303. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, millions of shares of Graphic Packaging's common stock were actively and publicly traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed

Class. Record owners and other members of the Class may be identified from records maintained by Graphic Packaging or its transfer agent(s) and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

304. Lead Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

305. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants' misstated or omitted facts were material;

(b) whether Defendants' material misrepresentations and omissions as alleged herein violated the federal securities laws;

(c) whether, and to what extent, the market price of Graphic Packaging common stock was artificially inflated during the Class Period because of the alleged material misrepresentations and omissions;

(d) whether Defendants acted with the requisite level of scienter;

(e) whether the Individual Defendants were controlling persons of Graphic Packaging;

(f) whether Defendants' misrepresentations and omissions as alleged herein caused the Class to suffer a compensable loss; and

(g) whether members of the Class sustained damages, and the proper measure of damages.

306. Lead Plaintiff will adequately protect the interests of the Class and has retained counsel competent and experienced in class actions and securities litigation. Lead Plaintiff has no interests that conflict with those of the Class.

307. A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIV. CLAIMS OF RELIEF

### COUNT I
### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### against Defendants Graphic Packaging, Doss, and Scherger

308. Lead Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

309. This Count is asserted on behalf of all members of the Class against Defendants Graphic Packaging, Doss, and Scherger for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

310. As alleged herein, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, made, caused to be made, approved, or disseminated materially false and misleading statements and omissions of material fact necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants intended to and did, as alleged herein: (i) deceive the investing public, including Lead Plaintiff and the Class; (ii) artificially manipulate the price of Graphic Packaging common stock; and (iii) cause Lead Plaintiff

and members of the Class to purchase Graphic Packaging common stock at artificially inflated prices.

311. The Individual Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Lead Plaintiff and members of the Class, by virtue of having made public statements and prepared, approved, signed, and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

312. As set forth above, Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Lead Plaintiff and members of the Class who purchased Graphic Packaging common stock during the Class Period. Defendants knew the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. Defendants, by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

313. In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market

price for Graphic Packaging common stock, Lead Plaintiff and members of the Class purchased Graphic Packaging common stock at artificially inflated prices during the Class Period. But for the fraud, Lead Plaintiff and members of the Class would not have purchased Graphic Packaging at such artificially inflated prices. As the true facts were subsequently disclosed, the price of Graphic Packaging common stock declined precipitously, and Lead Plaintiff and members of the Class were damaged and harmed as a direct and proximate result of their purchases of Graphic Packaging common stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth was continuously disclosed.

314. As a result of the wrongful conduct alleged herein, Lead Plaintiff and other members of the Class have suffered economic harm in an amount to be established at trial.

315. By virtue of the foregoing, Defendants are liable to Lead Plaintiff and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

316. This claim is timely within the applicable statutes of limitations and repose.

**COUNT II**
**For Violation of Section 20(a) of the Exchange Act**
**against the Individual Defendants**

317. Lead Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

318. This Count is asserted on behalf of all members of the Class against the Individual Defendants for violation of Section 20(a) of the Exchange Act.

319. As set forth above, each of the Individual Defendants were controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants acted as controlling persons of Graphic Packaging within the meaning of Section 20(a) of the

Exchange Act by virtue of their executive positions and their culpable participation, as alleged above. The Control Person Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends were false and misleading, as well as the fraudulent course of conduct and scheme alleged herein. The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

320. In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance and had the power and ability to control public statements about Graphic Packaging and the actions of Graphic Packaging and its employees. The Individual Defendants were each directly involved in providing false information and certifying and/or approving the materially false or misleading statements disseminated by Graphic Packaging during the Class Period. Moreover, each of the Individual Defendants were directly involved in or orchestrated the undisclosed fraudulent scheme alleged herein. As a result of the foregoing, the Individual Defendants each were controlling persons of Graphic Packaging within the meaning of Section 20(a) of the Exchange Act.

321. As alleged above, Graphic Packaging violated Section 10(b) of the Exchange Act by its material misrepresentations and omissions, and undisclosed fraudulent scheme, as alleged in this Complaint. By virtue of their positions as controlling persons of Graphic Packaging and as a result of their own aforementioned conduct, the Individual Defendants are each liable pursuant

to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act of Rule 10b-5 promulgated thereunder, to Lead Plaintiff and the other members of the Class who purchased or otherwise acquired Graphic Packaging common stock. Moreover, as alleged above, during the respective times that the Individual Defendants served as officers or high-level executives of Graphic Packaging or spoke directly to Graphic Packaging investors during analyst conference calls, each of the Individual Defendants culpably participated in the material misstatements and omissions made by Graphic Packaging, as set forth above.

322. As a direct and proximate result of the wrongful conduct by the Individual Defendants, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases or acquisitions of Graphic Packaging common stock during the Class Period.

323. This claim is timely within the applicable statutes of limitations and repose.

## XV. REQUEST FOR RELIEF

324. WHEREFORE, Lead Plaintiff respectfully pray for judgment against Defendants as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure, certifying the Class, appointing Lead Plaintiff as Class Representative, and appointing Lead Counsel as Class Counsel pursuant to Rule 23(g);

(b) Awarding compensatory damages in favor of Lead Plaintiff and the members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorneys' and expert fees; and

(d) Awarding such other and further relief as the Court may deem just and proper.

## XVI. JURY TRIAL DEMAND

Lead Plaintiff demands a trial by jury.

DATED: September 29, 2026

Respectfully submitted,

*/s/ Alfred L. Fatale III*

**LABATON KELLER SUCHAROW LLP**
Alfred L. Fatale III
Joseph Cotilletta
Jessica N. Goudreault
David Saldamando
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
afatale@labaton.com
jcotilletta@labaton.com
jgoudreault@labaton.com
dsaldamando@labaton.com

**CERTIFICATE OF SERVICE**

I certify that this 29th day of September 2026, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Notice of Electronic Filing.

/s/ *Alfred L. Fatale III*
Alfred L. Fatale III